DECISION.
{¶ 1} In April 1993, inmates rioted at the Southern Ohio Correctional Facility in Lucasville, Ohio. On the fifth day of the eleven-day riot, inmates killed Corrections Officer Robert Vallandingham. Defendant-appellant James Were was convicted in 1995 of one count of kidnapping and two counts of aggravated murder for his participation in Vallandingham's kidnapping and death. We affirmed his convictions. But the Ohio Supreme Court reversed, holding that Were was deprived of a fair trial because the trial court failed to hold a competency hearing.[1]
 {¶ 2} After a second trial, a new jury again found Were guilty of one count of kidnapping and two counts of aggravated murder. The jury recommended the death penalty for the murder convictions, and the trial court again sentenced Were to death. We affirm.
 I. The Case for Murder {¶ 3} After the inmates surrendered and the riot was officially over, authorities took over 5,000 photos and 20,000 samples of physical evidence from the prison. Despite this, no physical evidence relating to Vallandingham's death remained. Because of the lack of physical evidence, the state's case against Were consisted almost completely of witness testimony and several "tunnel tapes." The tunnel tapes were audio recordings secretly made of the inmates during the riot.
 {¶ 4} In sum, the state presented the testimony of nine witnesses. The state presented Lieutenant Howard Hudson of the Ohio State Highway Patrol, who was the chief officer in charge during the riot, and Dr. Patrick Fardal, the pathologist who conducted the autopsy on Vallandingham. The state also called as witnesses six inmates who were either in the prison during the riot or incarcerated with Were after the riot. Finally, the state presented Mark Piepmeier, the Lucasville Special Prosecutor, who testified about previous statements made by Were when he had testified in other Lucasville prosecutions.
 {¶ 5} Lieutenant Hudson testified that in April 1993 he was the Sergeant supervisor of the Office of Investigative Services for the Ohio State Highway Patrol. Hudson explained that the Ohio State Highway Patrol had the authority and responsibility to investigate offenses that occurred on state-owned property, which included the state penal institutions.
 {¶ 6} Hudson testified that, in 1993, the Lucasville prison was the state's maximum-security institution. The riot began shortly after 3:00 p.m. on April 11, 1993. Hudson arrived on the scene at about 6:00 that night, and except for going home once to shower and change clothes, he was "onsite 24 hours a day for the entire eleven days of the riot."
 {¶ 7} Hudson testified that, soon after the start of the riot, the inmates had taken over the entire L-complex, also called L-block, of the prison. L-complex contained eight cellblocks, and each cellblock contained 80 cells. The inmates also had taken control of the gymnasium and the recreational yard. When Hudson arrived, several hundred inmates were outside in the yard, and about four hundred were inside L-block. The inmates held twelve correction officers as hostages, including Vallandingham.
 {¶ 8} Prior to the riot, three main gangs existed in the prison. The largest and most powerful gang was the Muslims. They numbered about 90, and their leaders included Carlos Sanders, also known as Hasan, Stanley Cummings, Leroy Ellmore, and James Were. The second largest gang was the Aryan Brotherhood, a white supremacy group headed by George Skatzes and Jason Robb. The Aryans had about 60 members. Other Aryan leaders included Roger Snodgrass, Tramp Johnson, and Jesse Bocook. The third and smallest gang of about 20 members was the Black Gangster Disciples, led by Anthony Lavelle. Despite the existence of the three gangs, the majority of inmates did not belong to any gang.
 {¶ 9} The Muslims initiated the plan of April 11 to revolt and take over a part of the prison. But once the rebellion began, the other gangs apparently seized the opportunity and joined in. Inmates testified that each of the three gangs quickly staked out separate territory within L-block and held their own hostages. The gangs controlled who came and went within their secured areas.
 {¶ 10} Hudson testified that, in the evening of the first day of the riot, the inmates placed five dead bodies in the yard, all inmates. The inmates also placed two severely injured inmates in the yard and released four of the twelve corrections officers, each of whom had severe head injuries. Late in the evening of the first day, the inmates in the yard were surrounded by authorities and taken back into the part of the prison not under inmate control.
 {¶ 11} Early in the second day of the riot, the inmates placed a sixth inmate body out in the yard. Hudson testified that communication with the inmates began shortly after the inmates took control, but that organized negotiations did not begin until the second day. Also on the second day, the power and water were turned off inside Lblock.
 {¶ 12} Underneath the entire L-complex lay large tunnels that contained all the plumbing and electrical wiring for each individual cell above. Authorities maintained control of these tunnels throughout the riot. On the second day, with the hope of locating the hostages and launching a rescue mission, SWAT members placed Ohio State Highway Patrol listening devices in crevices below the cells. Hudson testified that this equipment — small body-wire packs with microphones — was not very sophisticated, and that the batteries had to be changed every two or three hours.
 {¶ 13} Shortly after this equipment was installed, the FBI supplied more sophisticated equipment. The FBI had high-speed silent drills and "spike mikes" the size of a pencil eraser. The FBI equipment did not require batteries, and the line from the microphone plugged directly into a tape recorder. The FBI set up ten separate listening stations under L-complex. Hudson testified that a total of 591 90-minute tapes, later called the tunnel tapes, were recorded during the riot.
 {¶ 14} Despite the obvious differences in philosophies, the leaders of the separate gangs worked together during the riot to negotiate with prison officials. Prison officials spoke with a number of different inmates throughout the negotiations.
 {¶ 15} Hudson testified that they first spoke with an inmate named James Bell, a Muslim. They then spoke with Skatzes, a captain in the Aryan Brotherhood. Additionally, they spoke to Lavelle, the leader of the Black Gangster Disciples. Near the end of the riot, prison officials dealt with Robb, the co-director of the Aryans.
 {¶ 16} On April 14, the fourth day of the riot, the public information officer for the Department of Corrections made a statement to the media in response to a question about threats from the inmates. She stated that there had been threats made throughout the riot, but that threats were a standard part of negotiations. According to Hudson, the media spin placed on her statement made it sound as if the authorities did not take the inmates seriously. The inmates, who were following the news on batteryoperated televisions and radios inside the prison, became very angry.
 {¶ 17} The next morning, shortly after 9:00 a.m., Skatzes, who was handling negotiations at that time, told prison officials that if they did not turn the water and power on by 10:30 a.m., the inmates would kill a guard. Authorities did not turn the power or water on. At 11:10 a.m., four masked inmates carried out into the yard the dead body of Vallandingham wrapped in sheets and blankets.
 {¶ 18} Fardal, the forensic pathologist who performed the autopsy on Vallandingham, estimated that Vallandingham was killed sometime in the morning of April 15, 1993. He also testified that Vallandingham had died by ligature strangulation.
 {¶ 19} During Officer Hudson's testimony, the state played for the jury two of the tunnel tapes. The first tape, number 61, was recorded on the morning of April 15, 1993, from 8:07 until 8:52. The second tunnel tape, number 32, was recorded on April 17, 1993, from 11:30 a.m. to 12:45 p.m.
 {¶ 20} The quality of the tapes was poor, due to the acoustics of the prison and background noise. As an aid, the court allowed the jury to have transcripts of the tunnel tapes that were prepared by Officer Hudson and other investigators.
 {¶ 21} Before trial, Were had objected to the jury having the transcripts of the tapes while listening to them. The court initially sustained Were's objection. It stated that the transcripts prepared by Hudson would not be admitted. The court then ordered the court reporter to listen to the tapes and make new transcripts.
 {¶ 22} A few days later, the court reporter testified that she had listened to the tapes five or six times and created new transcripts. She stated that she had worked with Hudson to identify the voices. She testified that the tapes were very difficult to hear and understand, and that portions of her transcripts differed from those of Hudson. She also stated that she felt that, given the short time she was given to create the transcripts, they did not "meet a standard that I'm used to as a court reporter."
 {¶ 23} The court then reversed its earlier decision. It decided to admit the transcripts created by Hudson as an aid for the jury. At trial, when the jury listened to the tapes, the court told the jury that the tapes were the evidence and that the transcripts were not. The court told the jurors that the transcripts were given to them only to help them to understand the tapes. The court also instructed the jurors that if there was a discrepancy between a transcript and the tape, they were to rely only on the tape.
 {¶ 24} At trial, Hudson testified that he had listened to the tapes at least several dozen times in the ten years since the riot and had worked with other investigators to identify the voices on the tapes. Hudson also testified that he was personally familiar with the voices of Were, Lavelle, Robb, Cummings, Snodgrass, and Skatzes. He also testified that investigators had listened to the tapes with several different inmates who had helped to identify the voices. Hudson testified that he and other investigators had spent "months and months, if not years" creating the transcripts. He stated that it was an "ongoing, lengthy process throughout the investigation and then throughout the other hearings and trials." He testified that the transcripts were a reasonably fair, true, and accurate account of the tapes.
 {¶ 25} On tape 61, recorded the morning that Vallandingham was killed, the inmate leaders discussed killing one of the prison guards. On the tape, Were described himself as a hardliner and urged the others to be firmer in the negotiations. Were said, "We give a certain time, a certain time. If it's not on in a certain time, that's when a body goes out."
 {¶ 26} The state played for the jury the second tunnel tape, number 32, which was recorded on April 17, 1993, from 11:30 a.m. to 12:45 p.m. This was several days after Vallandingham had been killed. On the tape, a recording of another meeting of the inmate leaders, Were argued that the hardliners should control the negotiations.
 {¶ 27} Were said, "If everybody can recall when we first started to see improvement in here, when we sent an officer out there, that is when we started to get to see some improvement. * * * When that officer went out there, that body went out there, that is when they began to see that we is serious, because all along they said that we are not serious. * * * It has been turned over to the hardliners, then when that body was still out there, that is when we started receiving some benefits."
 {¶ 28} Were continued, "They trust the hardliner because that is when they sent our stuff in cause they seen we was not bullshitting. I am putting it just like this (inaudible) now if we have to throw another body, it will let people know the hardliners will put their foot down and (inaudible) do we have to, no, I don't want to kill another guard. Do you know why, cause what I think. I don't give a damn you understand if some of the hostages die slow, or die at all, if I have to die, or we have to die, so I feel then if I cut off a man's fingers, I will cut the man's hand off and go out there and say now, I am going to let you know we ain't interested in killing your hostages. They'll die slow, since you all want to play games."
 {¶ 29} A short time later, Were said, "[T]hey only respect firmness. That is the only thing they going to respect. * * * I don't give a damn if it has to be on national TV, for them to see me personally, cut one of them dudes hands off and give it to them and spit it out of my mouth for them to know how serious I am about what we believe in. I don't care nothing about no electric chair. I don't care nothing about no other case. I care about what the people and only about the people in here. We got what they want and they got what we want. * * * See if you don't put a hardliner on, or we don't stand firm and work together, we are not going to achieve what we are trying to achieve."
 {¶ 30} Hudson testified that the quality of tunnel tape 32 was better than number 61, but that it was still difficult to understand. He testified that the transcript would help the jury to decipher the voices on the tape. He stated that the transcript was a fair, true, and accurate rendition of the conversations on the tape. Before playing the tape, the court again told the jury that the tape was evidence but that the transcript was not, and that the transcript was provided only to assist the jury in understanding the tape.
 II. Inmate Witnesses {¶ 31} Steve Macko testified that when the riot began, he heard, amid the commotion, Officer Vallandingham order all the inmates into their cells. Macko then saw Vallandingham go to the phone and eventually lock himself in the officers' bathroom. After Vallandingham secured himself in the bathroom, inmates succeeded in breaking into the cellblock.
 {¶ 32} Macko testified that Skatzes went to a console and opened up the cell doors, freeing all the prisoners in that cellblock. Macko came out of his cell and watched as Were and other inmates took a metal desk and began battering the door to the bathroom containing Vallandingham. After numerous blows with the desk, the inmates broke through the bathroom door. Macko saw Were, Reginald Williams, and several others remove Vallandingham from the bathroom, handcuff him, and lead him away. Macko testified that he never saw Vallandingham again.
 {¶ 33} Reginald Williams, a Muslim, testified that, during the early part of the riot, he was instructed by Sanders to see if any corrections officers remained in L-1. On his way to L-1, he saw inmates beating on a bathroom door. The inmates told him that a corrections officer had barricaded himself in the bathroom. Williams testified that he told the inmates to stop beating on the door, and that he went to the door and asked who was inside. Vallandingham identified himself. According to Williams, he gave Vallandingham his word as a Muslim that if he came out, nothing would happen to him. Vallandingham came out.
 {¶ 34} Williams testified that one inmate hit Vallandingham in the back of the head, and that other inmates took his keys and watch. Williams testified that he, Were, and Sanders took Vallandingham out of the bathroom and escorted him to the L-6 shower area. They handcuffed him and put a sheet over his head.
 {¶ 35} Williams also testified that, before the riot, Were was considered one of the leaders of the Muslims in the prison. During the riot, Were wore a striped referee's shirt, signifying that he was allowed access to any area controlled by the prisoners.
 {¶ 36} Williams testified that, during the riot, he acted as a security guard for Sanders and escorted Sanders to the meeting of the inmate leaders held on the morning of April 15. According to Williams, Were was at the meeting, and after it ended, Were was "pretty hyper." Williams testified, "He was talking about that he would do it, he would take care of it, and hardliners was going to take over."
 {¶ 37} Williams further testified that, after the riot, he was sent to a prison in Mansfield, Ohio. In June 1993, Williams and Were were transported together from Mansfield back to Lucasville. As they approached the prison in Lucasville, Williams noticed that Were looked worried. Williams asked Were what was bothering him. Were whispered to Williams, "I think they know I killed that guard."
 {¶ 38} Roger Snodgrass testified that, throughout the riot, he was chief of security for the Aryan Brotherhood. In that position, Snodgrass attended most of the meetings of the inmate leaders. He testified that he was at the meeting of the leaders on the morning of April 15, 1993. According to Snodgrass, Were was one of the hardliners who wanted to kill a corrections officer to show that the inmates were serious. Snodgrass testified that a vote was taken, and that Were voted, along with everyone else, to kill a corrections officer. The leaders also decided that Vallandingham would be the guard to be killed, because he had seen Sanders and Cummings kill another inmate when the riot started.
 {¶ 39} Thomas Taylor testified that, during the riot, the Muslims locked him in his cell for his own protection. While in his cell, Taylor could see the corrections officers that the Muslims held hostage, including Vallandingham. Taylor testified that, at a certain point during the riot, many inmates became upset at a statement made by a prison spokeswoman. The inmates said that they had to show some force and had to show what they were willing to do. Soon after that, Taylor saw Were and another man come to Vallandingham's cell, take him out, and lead him away. Taylor testified that, a short time later, he heard that an officer had been killed.
 {¶ 40} Sherman Simms testified that, during the riot, the Muslims controlled the area containing his cell, so he stayed in a different area. On the morning of April 15, a Muslim inmate named Artiste allowed Simms into his cell for a few minutes to collect some of his personal belongings.
 {¶ 41} To leave his cell area, Simms had to walk by the shower, where he noticed a crowd of people. Simms testified that, as he approached the shower area, he saw Were standing with his back to him and watching what was going on in the shower. As Simms walked by, Were turned around, saw Simms, and asked him what he was doing in the area. Simms told Were that Artiste had let him in, and Were confirmed that with Artiste. While that exchange took place, Simms looked into the shower and saw that a person was being strangled. Simms testified that he first saw two people choking the person with a rope. He then saw an individual put a weight bar against the person's throat.
 {¶ 42} Were then told Simms that he would have to help carry the body out. Were directed the inmates to wrap the body in sheets. Simms and three other inmates carried the body out to the recreation yard.
 {¶ 43} Charles Austin testified that he met Were in 2001 when they were both in prison in Youngstown, Ohio. The two had numerous conversations while in their cells and in the recreation area. Austin testified that Were told him that he was the one who had kidnapped, robbed, and killed Officer Vallandingham. Were stated that he had strangled Vallandingham, and that Sanders had instructed him to carry the body out to the yard.
 {¶ 44} Finally, Mark Piepmeier testified that he was the lead special prosecutor for crimes committed during the Lucasville riot. Piepmeier said that Derrick Cannon was an inmate indicted for crimes committed during the riot, and that Were had testified at Cannon's trial on his behalf. According to Piepmeier, Were testified that he was present when Vallandingham was killed.
 {¶ 45} In his defense, Were presented the testimony of four inmates. Thomas Blackmon testified that, in the year after the riot, Sherman Simms and Reggie Williams had each separately told him that the state was pressuring them to say that Were was involved in Vallandingham's death.
 {¶ 46} Gregory Durkin, a member of the Aryan Brotherhood, testified that at one point during the riot he was with Skatzes while Skatzes was on the phone with the negotiators. Anthony Lavelle handed Skatzes a note to read to the negotiators, informing them that the hardliners were taking over. Durkin testified that he attended all the meetings of the inmate leaders as security for Skatzes, except for several meetings where he had to wait outside the door. He testified that there was never a vote to kill a guard, and that he did not consider Were to have been one of the hardliners.
 {¶ 47} Brian Eskridge testified that, before and during the riot, he was a Gangster Disciple, which was similar to a Black Gangster Disciple. He testified that after the prison spokeswoman made the statement that enraged the inmates, Lavelle told him that they needed to kill a corrections officer to show that they were serious. Eskridge did nothing at the time. The next day, he heard that Vallandingham had been killed. According to Eskridge, the day after the killing, Lavelle was angry at him for not participating in the killing. As punishment, Lavelle had Eskridge beaten up.
 {¶ 48} Aaron Jefferson also testified that, before Vallandingham was killed, Lavelle had approached him about killing a guard.
 {¶ 49} The final witness called by Were was Lieutenant Hudson. Hudson explained that tunnel tape 60 was recorded on April 16, 1993, from 12:11 a.m. to 8:36 a.m. Hudson also testified that the transcript for tape 60 was prepared in like manner with the transcripts for tapes 61 and 32. The tape was played and the jury was given the transcript. The trial court again told the jury that the tape was the evidence, and that the transcript was only an aid.
 {¶ 50} On the tape, the inmates discussed their grievances with the prison administration and their goals for the negotiations. Lavelle said to another inmate, "[Y]ou must understand now where George, Robb, and I, we have to concern ourselves now, with we're going to wind this thing up with our own safety, and especially with us keeping off that death row over there about that guard getting offed. I don't care about the inmates, cause they are going to say we did it."
 III. Mental Retardation — A Jury Question? {¶ 51} In this appeal, Were advances twenty-four assignments of error. In his first and twenty-third assignments, Were argues that the jury should have participated in the determination of whether he was mentally retarded.
 {¶ 52} In Atkins v. Virginia, the United States Supreme Court held that an execution of a mentally retarded criminal is a cruel and unusual punishment prohibited by the Eighth Amendment.[2] In State v. Lott, the Ohio Supreme Court established procedures for determining whether an individual is mentally retarded for purposes of escaping execution.[3]
 {¶ 53} First, the Lott court adopted a three-part definition of mental retardation. The definition requires (1) significantly subaverage intellectual functioning; (2) significant limitations in two or more adaptive skills, such as communication, selfcare, and self-direction; and (3) onset of the dysfunction before the age of 18.[4] The court also held that the defendant bears the burden of establishing that he or she is mentally retarded by a preponderance of the evidence.[5]
 {¶ 54} The Lott court then decided that mental retardation is a factual issue that should be resolved by the trial court. The court further held that a trial court should conduct a de novo review of the evidence, including professional evaluations of the defendant. The trial court should then make written findings giving its rationale for its finding on the issue of mental retardation.
 {¶ 55} The Lott court specifically held that "these matters should be decided by the court and do not represent a jury question. In this regard, a trial court's ruling on mental retardation should be conducted in a manner comparable to a ruling on competency (i.e., the judge, not the jury, decides the issue)."[6]
 {¶ 56} In Blakely v. Washington, the United States Supreme Court held that a trial court cannot enhance a penalty beyond the statutory maximum based on any factors other than those on which the jury has found the defendant guilty.[7]
 {¶ 57} Were notes that the jury did not make any finding concerning whether he was mentally retarded. Instead, the trial court followed Lott
and held a mentalretardation hearing. The court found that Were had not proved by a preponderance of the evidence that he was mentally retarded. After the jury found the existence of the appropriate aggravating circumstances and recommended the death penalty, the trial court adopted that recommendation as its sentence.
 {¶ 58} Were argues that if a jury had found that he was mentally retarded, he could not have received the death sentence. Therefore, Were contends that non-retardation was an essential fact that the jury should have decided before the court could have imposed a lawful death sentence.
 {¶ 59} But Were misconstrues Blakely. The court's finding of nonretardation did not enhance Were's penalty. The finding of non-retardation simply meant that there was nothing to prevent the court from imposing the maximum penalty of death. The issue of retardation can affect a sentence only by mitigating it. It can never enhance it.
 {¶ 60} To follow Were's logic, for a court to impose the death penalty, a jury would have to find beyond a reasonable doubt that a defendant was not mentally retarded. This would be an almost impossible burden. It would be especially difficult when a defendant, such as Were, refused to take any tests or to speak with any professional sent to evaluate him.
 {¶ 61} We conclude that the procedures set forth in Lott for determining whether a defendant is mentally retarded are unaffected byBlakely. Under Lott, a court, not a jury, should decide whether a defendant is mentally retarded. Therefore, we overrule Were's first and twenty-third assignments of error.
 IV. Mental-Retardation Hearing {¶ 62} In his second assignment of error, Were argues that the trial court's finding that he was not mentally retarded was based upon insufficient evidence and was contrary to the manifest weight of the evidence.
 {¶ 63} After the jury found Were guilty of kidnapping and aggravated murder, the court held a hearing to determine whether Were was mentally retarded. Were admitted the videotaped testimony of Jacalyn McCullough, a prison teacher with a special-education background who had worked with Were while he was incarcerated.
 {¶ 64} McCullough testified that all students in the prison took tests to initially assess their academic level. She said that Were tested in the lowest of three classifications, and that in reading, math, and writing, he functioned at approximately a second- or third-grade level.
 {¶ 65} McCullough testified that she worked with Were for over a year, and that he was a hard-working and conscientious student during that time. But despite his hard work, Were was not able to advance much and found even simple assignments frustrating.
 {¶ 66} McCullough testified that Were had trouble comprehending and retaining abstract concepts. She said that Were was never able to do work at a level that would have allowed him to pass the pre-GED test, which was essentially a sixth-gradelevel test. She further testified that she believed, based on Were's comprehension and reading ability, that in a normal school setting he would have been a special-education student. She also believed that he would have been considered developmentally handicapped.
 {¶ 67} Were also introduced the transcripts of previous testimony given by Daniel Coleman, Danny Grant, and John William Harris. All three were inmates with Were at various times.
 {¶ 68} Coleman testified that he helped Were with his school work. He testified that Were had trouble understanding directions and remembering explanations. He also said that Were had asked him to explain legal papers that he received while in prison.
 {¶ 69} Grant and Harris both testified that they helped Were with his legal filings. Grant said that Were had difficulty understanding explanations and needed things repeated before he understood. Harris testified that he had to explain things to Were several times before he understood. He also said that Were would sometimes ask the same question five minutes after getting an answer. Grant said that he would draft Were's legal motions, and that Were would simply copy the motions in his own handwriting.
 {¶ 70} Were called Dr. David Hammer, a psychologist and expert on mental retardation. Hammer stated the three-part definition of mental retardation. Hammer explained that, in general, an IQ score around 70 qualified a person as mentally retarded. Hammer testified that Were had taken two IQ tests as a child. When he was seven, Were scored a 69. When he was twelve, Were again scored a 69.
 {¶ 71} Hammer testified that, based on McCullough's testimony, he thought that Were had sub-average ability in several adaptive behaviors. Specifically, Hammer noted Were's difficulty in reading comprehension and his inability to do simple tasks, such as make change for a dollar. Hammer testified that, in his opinion, Were was mildly mentally retarded.
 {¶ 72} Dr. Timothy Rheinscheld, a clinical psychologist with a specialization in mental retardation, also testified on Were's behalf. Rheinscheld testified that, in his opinion, Were was mentally retarded. Rheinscheld testified that his opinion was based on the two IQ scores of 69 measured before Were was 18. He also based his opinion on deficits in Were's adaptive behavior as revealed by McCullough's testimony and by Were's prison record.
 {¶ 73} On cross-examination, both Hammer and Rheinscheld testified that the type of IQ test that Were took as a child was the Stanford-Binet. Both testified that the Wechsler test was the current standard IQ test. Both acknowledged that, on the Wechsler test, a score below 70 was considered mentally retarded, but that on the Stanford-Binet test, a score below 68 was considered mentally retarded. Both also acknowledged that claims of cultural bias had been made against the IQ tests administered when Were was a child. These charges had led to changes in the tests and to the adoption of the adaptivebehavior aspects of the mental-retardation definition.
 {¶ 74} The state presented only one witness at the mental-retardation hearing. Dr. Michael Nelson, a clinical psychologist, testified that, in his opinion, Were was not mentally retarded.
 {¶ 75} Nelson testified that on the Stanford-Binet test, a person with a score of 69 would not be classified as mentally retarded. He also testified that concerns about cultural bias within the IQ tests had led to the adoption of the other factors to determine mental retardation. Nelson stated that cultural bias tended to depress the IQ scores of minorities such as Were. Nelson also stated that most of the IQ test scores had a margin of error of plus or minus five points.
 {¶ 76} Nelson further testified that he did not find that Were had any serious deficits in adaptive functioning. Nelson noted that Were was considered a leader in a prison gang, and that he had "somewhat stable work functioning over three years" while out of prison.
 {¶ 77} The trial court found that Were had not proved by a preponderance of the evidence that he was mentally retarded. The trial court stated that Were's IQ scores of 69 were unreliable, given the cultural bias of the tests at the time Were took them. The court also said that even if the test scores were reliable, a score of 69 was not indicative of mental retardation. In its written findings, the court noted that Were had risen to leadership positions while in prison. The court also found that Were was articulate in court and wrote and presented numerous motions. Finally, the court found that Were had "no significant limitations in communication, daily living skills and socialization."
 {¶ 78} An appellate court will not reverse a trial court's finding on mental retardation provided that there was credible and reliable evidence supporting the trial court's conclusion.[8]
 {¶ 79} All three experts agreed that, at the time that Were took the IQ tests, the tests were culturally biased against minorities. Nelson testified that the effect of this bias would have been to artificially lower a minority's score. All three experts agreed that any IQ test would likely have a margin of error of about plus or minus five points. Nelson testified that Were's two test scores of 69 were not scores reflecting mental retardation.
 {¶ 80} Nelson testified that finding a serious deficiency in adaptive behavior required more than just anecdotal evidence. He noted that Were not only was a member of the Muslim prison gang, but had a position of authority in the gang. Nelson also stated that Were was involved in writing motions for the court and was able to comprehend the impact of his statements.
 {¶ 81} We conclude that there was credible and reliable evidence to support the trial court's finding that Were was not mentally retarded. Therefore, we overrule Were's second assignment of error.
 IV. Jury Instruction on Death Penalty {¶ 82} In his third assignment of error, Were contends that the trial court erred when it did not instruct the jury that the death penalty was not an option if the jury found that Were was mentally retarded.
 {¶ 83} As we have previously discussed, the Ohio Supreme Court inLott established procedures for determining whether a defendant is mentally retarded. The trial court followed the Lott procedures. The court found that Were was not mentally retarded. It was not an issue for the jury to determine. Therefore, there was no reason for the court to instruct the jury that the death penalty was not an option if it found Were to be mentally retarded.
 {¶ 84} We note that the trial court did allow the jury to consider Were's claim of mental retardation as a mitigating factor in the penalty phase. And the court told the jury that before it could recommend the death penalty, the state had to prove beyond a reasonable doubt that the aggravating factors outweighed the mitigating factors.
 {¶ 85} In his fourth assignment of error, Were argues that the trial court erred when it did not instruct the jury that the state was required to prove beyond a reasonable doubt that Were was not retarded before he could receive the death penalty. Were's argument has no merit. Given that the state was not required to prove beyond a reasonable doubt that Were was not retarded before the jury could recommend the death penalty, the trial court did not err in omitting that instruction. Therefore, we overrule Were's third and fourth assignments of error.
 V. Penalty Phase {¶ 86} In his fifth assignment of error, Were argues that the evidence in the penalty phase established that he was mentally retarded, and that he could not therefore receive the death penalty. In his sixth assignment of error, he claims that the aggravating circumstances did not outweigh the mitigating factors beyond a reasonable doubt.
 {¶ 87} The jury returned its guilty verdict for aggravated murder with two specifications. First, the jury found that Were had committed aggravated murder purposely and with prior calculation and design while he was a prisoner in a detention facility. Second, the jury found that Were had committed aggravated murder purposely and with prior calculation and design during a kidnapping. These specifications, found beyond a reasonable doubt, served as the aggravating factors in the penalty phase.
 {¶ 88} In mitigation, Were presented evidence of his mental retardation. He introduced the testimony of McCullough, the prison teacher, and two psychologists, Drs. Hammer and Rheinscheld. All three echoed their previous testimony at the mentalretardation hearing (which was not in front of the jury). The state presented no evidence concerning Were's alleged mental retardation.
 {¶ 89} Were also introduced as a mitigating factor that he was not the principal offender, that is, the actual killer of Vallandingham. In addition, the court instructed the jury to consider any other factors that weighed in favor of a sentence other than death.
 {¶ 90} Were argues that without any evidence from the state to rebut his evidence of mental retardation, the jury had no choice but to find Were mentally retarded. That is not so.
 {¶ 91} The state cross-examined each of Were's witnesses. And the Ohio Supreme Court has stated that expert testimony, even when uncontradicted, is not necessarily conclusive.[9] The state also introduced the tunnel tapes, allowing the jury to assess for itself Were's mental abilities. We conclude that the evidence presented by Were in this phase did not establish that he was mentally retarded.
 {¶ 92} In addition, evidence of Were's alleged mental retardation was presented to the jury only as a mitigating factor. Even if the jury had determined that Were had some mental deficiency, under statute, "[t]he existence of any of the mitigating factors * * * does not preclude the imposition of a sentence of death."[10]
 {¶ 93} We also reject Were's contention that he had only a "minor" role in Vallandingham's murder. Were admitted to both Reggie Williams and Charles Austin that he had killed Vallandingham. The evidence showed that Were was involved in the decision to kill Vallandingham and in carrying that decision out. We conclude that the aggravating circumstances outweighed the mitigating factors beyond a reasonable doubt.
 {¶ 94} Therefore, we overrule Were's fifth and sixth assignments of error.
 VI. Competency {¶ 95} In his next two assignments of error, Were argues that he was legally incompetent to stand trial. Therefore, he contends that the trial court violated his dueprocess rights and should not have overruled his motion for a new trial.
 {¶ 96} Were's previous convictions for kidnapping and murdering Vallandingham were overturned by the Ohio Supreme Court because he did not receive a competency hearing. Upon remand, the trial court held a competency hearing.
 {¶ 97} As he had prior to his first trial, Were refused to cooperate with any professionals sent to evaluate him. Therefore, the state presented two witnesses, both prison employees who had numerous interactions with Were. Alan Barr, a correctional program specialist, and Marva Allen, a unit manager, testified that Were's behavior was always responsive and appropriate. Both said that Were had a good understanding of prison rules. Allen stated that prison workers kept a log of Were's activities, and that all of his behavior was normal. Allen also testified that Were could fill out prison forms on his own and that he knew he was being tested for competency.
 {¶ 98} Were presented the testimony of the three inmates, Coleman, Grant, and Harris, who later testified at his mental-retardation hearing. All three testified as they would at the retardation hearing. All three said that Were had difficulty understanding and remembering instructions and explanations. Coleman testified that Were was able to read and write. Were also introduced the testimony of a previous attorney, John Mackey, who stated that he believed that Were exhibited signs of paranoia.
 {¶ 99} The trial court then found that, by a preponderance of the evidence, Were was competent to stand trial. A few months later, the court reopened the competency hearing. The court allowed Were to present two additional witnesses, Jacalyn McCullough and Dr. David Hammer.
 {¶ 100} Both provided similar testimony to that given at Were's later mentalretardation hearing. McCullough testified that Were had difficulty with learning. Dr. Hammer testified that Were's low IQ and paranoia interfered with his ability to cooperate with his attorneys. After this additional testimony, the trial court again held that Were was competent to stand trial.
 {¶ 101} In a competency hearing, a defendant is presumed competent to stand trial.[11] The burden was on Were to prove by a preponderance of the evidence that he was incapable of understanding the nature and objective of the proceedings against him or of presently assisting in his defense.[12] We will not reverse a trial court's finding on competency provided that there was credible and reliable evidence supporting the trial court's conclusion.[13]
 {¶ 102} The trial court stated that much of Were's evidence at the competency hearing related to his intelligence, but not necessarily to his competence. The trial court then found that Were was capable of communicating with his lawyers when he chose to. We conclude that there was credible and reliable evidence supporting the trial court's pretrial conclusion that Were was competent to stand trial. We also conclude that Were's post-trial motion for a new trial based on his incompetency was properly denied.
 {¶ 103} Therefore, Were's seventh and eighth assignments of error are overruled.
 VII. Alleged Prosecutorial Misconduct {¶ 104} In his ninth assignment of error, Were argues that there were several instances of prosecutorial misconduct in the penalty phase of his trial. To address these arguments, we must determine (1) whether the prosecutor's conduct was improper, and (2) if so, whether it prejudicially affected Were's substantial rights.[14] The touchstone of the analysis "is the fairness of the trial, not the culpability of the prosecutor."[15] We will not deem a trial unfair if it appears clear beyond a reasonable doubt that the jury would have recommended the death sentence even without the alleged misconduct.[16]
 {¶ 105} During the penalty phase, the prosecutor stated, "But for the Muslims, the Black Gangster Disciples, the Aryans, Officer Vallandingham would be alive to this day. They sat and plotted his murder and put it into effect. Nothing in James Were's background, his past, his character, diminished or affected that. The defense psychologist even told you that he knew what he was doing was wrong, that he would have known, that his degree of mental state, his degree of learning, that to participate in the death of a fellow human being was wrong, and he knew it." The court overruled the defense's objection to the statement.
 {¶ 106} Were now argues that the reference to the prison gangs would have caused fear in the average person and suggested to the jury that Were should die because he was involved with a gang.
 {¶ 107} But with the statement viewed in a larger context, the prosecutor was responding to an argument Were's counsel had made. In her opening statement, Were's counsel urged the jury to think of him as a scared fourth-grader, "surrounded by violence and weapons and egged on by leaders who didn't want to get their own hands dirty."
 {¶ 108} The prosecutor responded, "A picture was painted in opening statement, picture this through James Were's eyes. Fourth-grade boy out there in that hallway with weapons and violence and the chaos that was going on. He tests to the ability of a fourth or fifth grader, so look at it through that point of view. But you heard him speak and he wasn't a scared fourth or fifth grader out there in the hallway trying to hide and protect himself and save his life. He was one of the leaders of this entire thing. But for the Muslims, the Black Gangster Disciples, the Aryans, Officer Vallandingham would be alive to this day * * *."
 {¶ 109} The prosecutor's mention of the gangs and Were's involvement was not improper. The prosecutor rebutted Were's assertion that he was an outsider manipulated by the gangs. The prosecutor tried to bring attention to the evidence that showed that Were was not only in the Muslim gang, but a leader, and that he had a vote in the decision to kill Vallandingham.
 {¶ 110} Were also argues that his background and character were mitigating factors. He asserts that if they were not considered as mitigating factors, they should not have been mentioned or considered at all. But the purpose of the state's reference to Were's background and character was to assert that they were not mitigating. The state did not attempt to argue that they were aggravating circumstances.
 {¶ 111} Were further argues that the prosecutor mischaracterized Dr. Rheinscheld's testimony about when he had listened to the tunnel tapes. On cross-examination, Rheinscheld testified that he had only listened to one of the tunnel tapes. He said that he did not remember what Were had said on the tape. He also stated that he had listened to the tape while driving to court to testify that morning. He did say that he had listened to it a "little bit" the week before.
 {¶ 112} In argument, the prosecutor said that the doctor had not reviewed the two tapes that the jury had listened to. Upon objection, the prosecutor clarified, stating that Rheinscheld had heard part of one tape in the car while he was on the way to testify. We conclude that the state did not mischaracterize Rheinscheld's testimony. There was nothing incorrect or improper in the prosecutor's statement.
 {¶ 113} Were's next objection is that the prosecution played portions of a tunnel tape for the jury during the penalty phase.
 {¶ 114} In State v. Gumm, the Ohio Supreme Court stated, "[C]ounsel for the state at the penalty stage of a capital trial may introduce and comment upon * * * evidence rebutting the existence of any statutorily defined or other mitigating factors first asserted by the defendant."[17]
 {¶ 115} The state played portions of tunnel tape 32 in the penalty phase to rebut Were's mitigating factors. Those factors were that he was mentally retarded and that he had only a minor role in Vallandingham's death. Therefore, it was not improper for the state to play the tunnel tape during the penalty phase.
 {¶ 116} But Were further argues that, by playing the tape, the state based its argument for the death penalty on nonstatutory aggravating circumstances. Were contends that the playing of the tunnel tape focused the jury's attention on the nature and circumstances of the offense. And under State v. Wogenstahl, "[i]t is improper for prosecutors in the penalty phase of a capital trial to make any comment before a jury that the nature and circumstances of the offense are `aggravating circumstances.'"[18]
 {¶ 117} But Were does not specifically explain how the prosecution implied to the jury that the nature and circumstances were aggravating circumstances. The tunnel tapes were, of course, related to the nature and circumstances of Were's offenses. But they also rebutted Were's assertions that he was mentally retarded and that he did not play a significant role in the murder.
 {¶ 118} Furthermore, the record shows that the state and the trial court correctly identified the statutory aggravating circumstances. And the state did not directly state or imply that the nature and circumstances of Were's offenses were aggravating circumstances. Therefore, playing the tunnel tape was not prosecutorial misconduct.
 {¶ 119} Finally, Were argues that the cumulative effect of the prosecutor's prejudicial statements rendered his death sentence unconstitutional. Because we have found no prosecutorial misconduct, there was no cumulative error.
 {¶ 120} Therefore, we overrule Were's ninth assignment of error.
 VIII. Irrelevant Evidence in Penalty Phase {¶ 121} In his tenth assignment of error, Were argues that irrelevant evidence was admitted during the penalty phase. Were contends that tunnel tape 32 and the autopsy photographs were irrelevant because they were unrelated to either of the aggravating circumstances.
 {¶ 122} We have already determined that the admission and playing of tunnel tape 32 was proper. It was offered to rebut Were's assertions of mental retardation and that he had a minor role in the murder.
 {¶ 123} In addition, the state offered tunnel tape 32 to prove the aggravating circumstance of prior calculation and design. In Gumm, the Ohio Supreme Court held that is was proper for the state at the penalty stage of a capital trial to introduce any evidence relevant to the aggravating circumstances.[19]
 {¶ 124} The state admitted one autopsy photograph showing that Vallandingham had been strangled. The state argued that death by strangulation was indicative of prior calculation and design.
 {¶ 125} Both the tape and the one autopsy photograph admitted during the penalty phase were relevant to the aggravating circumstances. Therefore, we overrule Were's tenth assignment of error.
 IX. Death Penalty {¶ 126} In his eleventh assignment of error, Were argues that his death sentence was disproportionately severe when compared with sentences imposed for similar offenses. This argument has no merit.
 {¶ 127} The Ohio Supreme Court has already addressed this issue inState v. Steffen.[20] In Steffen, the court held, "The proportionality review required by R.C. 2929.05(A) is satisfied by a review of those cases already decided by the reviewing court in which the death penalty has been imposed."[21] The Ohio Supreme Court has summarily rejected this same argument numerous times since.[22] We therefore overrule this assignment of error.
 {¶ 128} In his twelfth assignment of error, Were claims that the trial court failed to enter a sufficient sentencing opinion. Specifically, he contends that the court did not explain its reasons for finding that aggravation outweighed mitigation. He also argues that the court found the nature and circumstances of the offense to be aggravating circumstances.
 {¶ 129} In State v. Skatzes, the Ohio Supreme Court stated, "A trial court is not required to accept or assign weight to mitigating evidence. Even if the trial court failed to explain its weighing process, inadequate explanations do not create reversible error. Moreover, any error in the trial court's sentencing opinion can be cured by our independent review."[23]
 {¶ 130} Based on this, we conclude the trial court sufficiently explained its reasons supporting its findings. We also are firmly convinced that the trial court did not transform the nature and circumstances of the crime into aggravating circumstances. Therefore, we overrule Were's twelfth assignment of error.
 {¶ 131} In his thirteenth assignment of error, Were argues that the death penalty is unconstitutional. Were offers nine reasons why the death penalty is unconstitutional. Seven of the claims are as follows: (1) the death penalty is without penalogical justification; (2) the death penalty is imposed in a discriminatory manner; (3) the double use of the underlying felony is unconstitutional; (4) the weighing process in mitigation is unconstitutional; (5) the Ohio statutes fail to provide for mercy; (6) Crim.R.11(C)(3) encourages guilty pleas; and (7) the standards for appellate review are insufficient.
 {¶ 132} The Ohio Supreme Court has already addressed and rejected these seven claims.[24] They require no further discussion from us.
 {¶ 133} Were also claims that the Ohio Supreme Court's decisions inGumm and Wogenstahl have rendered the death penalty unconstitutional. Specifically, he contends that Wogenstahl requires the jury to weigh improper, nonstatutory aggravating circumstances.
 {¶ 134} In Wogenstahl, the court stated that Gumm had not made Ohio's deathpenalty scheme unconstitutional.[25] The court then clarified its holding in Gumm, explicitly stating, "In the penalty phase of a capital trial, the `aggravating circumstances' against which the mitigating evidence is to be weighed are limited to the specifications of aggravating circumstances set forth in R.C. 2929.04(A)(1) through (8) that have been alleged in the indictment and proved beyond a reasonable doubt."[26] The court further acknowledged that the state can present evidence concerning the nature and circumstances of the aggravating circumstances. But the court admonished, "[I]t is wholly improper for the state to argue or suggest that the nature and circumstances of the offense are `aggravating circumstances.'"[27]
 {¶ 135} Were contends that a jury, having heard the nature and circumstances of the aggravating circumstances, would then have difficulty weighing only the statutory aggravating circumstances against the mitigation. We disagree. A jury is given explicit instructions about what it should consider. The jury should be able and is presumed to follow the trial court's instructions.[28]
 {¶ 136} Finally, Were argues that the death penalty is unconstitutional because the Ohio Supreme Court can overturn a conviction as being against the manifest weight of the evidence in a capital case only where the crime was committed after January 1, 1995. He claims that because the Ohio Supreme Court cannot review his weight-of-theevidence claim, he cannot receive a full and fair appeal of his convictions and sentence.
 {¶ 137} The Ohio Supreme Court has addressed this issue. In two other Lucasville riot cases involving the death penalty, the court acknowledged that it could only review manifest-weight claims for crimes committed after January 1, 1995.[29] The court then stated that it could treat a manifest-weight claim as a challenge to the legal sufficiency of the evidence. Therefore, Were's arguments have no merit, and we overrule his thirteenth assignment of error.
 X. Sufficiency and Weight {¶ 138} In his fourteenth and fifteenth assignments of error, Were argues that his convictions were supported by insufficient evidence and were against the manifest weight of the evidence. In his sixteenth assignment, he argues that the trial court erred when it denied his Crim.R. 29 motion for acquittal.
 {¶ 139} In criminal cases, the legal concepts of sufficiency of the evidence and weight of the evidence are distinct.[30] A challenge to the sufficiency of the evidence attacks the adequacy of the evidence presented. Whether the evidence is legally sufficient to sustain a conviction is a question of law.[31] The relevant inquiry in a claim of insufficiency is whether any rational factfinder, viewing the evidence in a light most favorable to the state, could have found the essential elements of the crime proved beyond a reasonable doubt.[32]
 {¶ 140} A challenge to the weight of the evidence attacks the credibility of the evidence presented.[33] When evaluating the manifest weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.[34] The discretionary power to reverse should be invoked only in exceptional cases "where the evidence weighs heavily against the conviction."[35]
 {¶ 141} While Were concedes that the crimes against Vallandingham were committed, he claims that he was not responsible. But the state presented ample evidence linking Were to the crimes.
 {¶ 142} Steve Macko testified that he saw Were and others break down the door to the bathroom where Vallandingham was hiding at the start of the riot. He watched Were and others handcuff and lead Vallandingham away. Reginald Williams testified that he, Were, and others took Vallandingham out of the bathroom, handcuffed him, and removed him to a secure site. Roger Snodgrass testified that Were was one of the inmate leaders who voted to kill a corrections officer. Thomas Taylor testified that, shortly before Vallandingham was killed, he saw Were and another man take him out of his cell and lead him away. And Sherman Simms testified that he saw Were supervising a group of men strangling a person.
 {¶ 143} In addition, several months after the murder, Were told Williams, "I think they know I killed that guard." And several years after the murder, Were confided in Charles Austin that he had kidnapped, robbed, and killed Officer Vallandingham.
 {¶ 144} The state also presented the two tunnel tapes. Were himself was heard describing how the inmates were not taken seriously until "that body went out there." He also stated that he did not want to kill another guard.
 {¶ 145} We conclude that a rational factfinder, viewing the evidence in a light most favorable to the state, could have found that the state had proved beyond a reasonable doubt that Were had committed the offenses of kidnapping and aggravated murder. Therefore, the evidence presented was legally sufficient to sustain his convictions.
 {¶ 146} Were makes much of the cross-examination of each of the inmate witnesses. Obviously, all had previous convictions for serious crimes. Many admitted that they did not initially come forward with their accounts of what they had witnessed during the riot. Most admitted that they had received or would receive some recognition from the state for their participation in Were's trial.
 {¶ 147} But the jury was free to believe some, all, or none of the testimony of the witnesses. Our review of the record does not persuade us that the jury clearly lost its way or created a manifest miscarriage of justice in finding Were guilty of his crimes.
 {¶ 148} Therefore, we overrule these three assignments of error.
 XI. Tunnel Tapes {¶ 149} In his seventeenth assignment of error, Were claims that the trial court erred when it overruled his motion to suppress the tunnel tapes. In his eighteenth assignment, he argues that allowing the tunnel tapes into evidence violated his right to private communications.
 {¶ 150} In State v. Robb, the Ohio Supreme Court considered the same argument.[36] Robb involved the same factual background of the Lucasville prison riot and the tunnel tape recordings. In Robb, the appellate court had held that the tunnel tapes should have been suppressed. The Ohio Supreme Court reversed.
 {¶ 151} In Robb, the state had argued that rioting inmates did not have a reasonable expectation of privacy. The state had claimed that it was, therefore, not bound by the statutory limits on warrantless recordings of oral conversations.
 {¶ 152} The Ohio Supreme Court admitted that privacy expectations were not a part of the pre-1996 statutory scheme in former R.C. 2933.51 etseq. The court then stated, "However, we cannot reasonably interpret former R.C. 2933.51 et seq. as granting a statutory right to privacy in communications between rioting inmates. The General Assembly could not have envisioned creating such a right in a state prison under siege. Granting privacy rights in these circumstances makes no sense in view of the state's interest in operating a prison and, in this case, restoring order, saving the lives of hostages and nonrioting prisoners, and protecting state property. `[A] statute should not be interpreted to yield an absurd result.'
 {¶ 153} "Nevertheless, we hold that former R.C. 2933.51 did not protect the inmate conversations in this case, but for an entirely different reason. Ohio law provided (and still provides) a specific statutory exception for federal electronic interceptions. Former R.C.2933.52(B)(1) stated that Ohio restrictions on electronic interceptions do not apply to an interception that is `made in accordance with section 802 of the `Omnibus Crime Control and Safe Street Act of 1968,'82 Stat. 237, 254, 18 U.S.C. 2510 to 2520 (1968), as amended.'
 {¶ 154} "In this case, FBI agents, acting under the authority of federal law, installed and monitored the electronic interception and recording devices that were used. Federal law explicitly defines `oral communications' as only those `exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation.'"[37]
 {¶ 155} The court went on to explain that the inmates had no right to expect any privacy in their cells. It stated, "The idea that rioting prisoners are entitled to privacy in plotting the deaths of guards and other prisoners is absurd." Therefore, the inmates' oral communications were not protected under the federal law.[38]
 {¶ 156} The Robb court also stated clearly that federal law, not state law, should control. The court noted that inmates "repeatedly asserted in negotiations that they wanted to consult with FBI officials and wanted the FBI to oversee the negotiations and surrender to protect their civil rights."[39]
 {¶ 157} Under the authority of Robb, we conclude that it was not error to deny Were's motion to suppress the tunnel tapes. Also, admission of the tapes into evidence did not violate Were's right to private communications. Therefore, we overrule his seventeenth and eighteenth assignments of error.
 XII. Transcripts of Tunnel Tapes {¶ 158} In his nineteenth assignment of error, Were argues that the trial court erred when it allowed the jury to receive and review the transcripts of the tunnel tapes.
 {¶ 159} Where there are no "material differences" between a tape admitted into evidence and a transcript given to the jury as a listening aid, there is no prejudicial error.[40]
 {¶ 160} In State v. Mason, the trial court allowed the jury to have the transcripts of a tape recording during its deliberations. A detective had testified that the transcripts were accurate. And the trial court had instructed the jury that the transcripts were "merely an aid to facilitate listening." The court also instructed the jury that if it found any difference between the tape and transcript, "You should disregard the transcript and use your own judgment as to what was said." The Ohio Supreme Court held there was no prejudicial error.
 {¶ 161} We have similarly held that providing a jury with a transcript is permissible when necessary as a listening aid and when the trial court gives appropriate instructions to the jury that the transcripts are not evidence.[41]
 {¶ 162} Were does not challenge the accuracy of the transcripts given to the jury. He complains only that a comparison between the transcripts created by Lieutenant Hudson and those created by the court reporter showed some differences.
 {¶ 163} But Hudson testified that he and his office had spent months, if not years, listening repeatedly to the tapes in an attempt to make the transcripts as accurate as possible. It was unlikely, given the poor quality of the tapes, that the court reporter could have duplicated Hudson's extensive efforts in a mere weekend by herself. Hudson testified that the transcripts were fair and accurate renditions of the conversations on the tapes.
 {¶ 164} In addition, the trial court clearly and repeatedly instructed the jury that the tapes were evidence and that the transcripts were not. The court told the jurors that the transcripts were to be used only as an aid in understanding the tapes. The court further instructed the jurors that if there was a discrepancy between a transcript and a tape, they were to rely only on the tape.
 {¶ 165} We conclude that there was no prejudicial error in allowing the jury to have the transcripts of the tapes. Therefore, we overrule Were's nineteenth assignment of error.
 XIII. Evidence Excluded {¶ 166} In his twentieth assignment of error, Were claims the trial court erroneously excluded evidence.
 {¶ 167} Aaron Jefferson, a defense witness, testified that, shortly before Vallandingham was killed, Anthony Lavelle had approached him about killing a guard. The state objected on hearsay grounds to Jefferson stating exactly what Lavelle had said to him. The court sustained the objection. Jefferson was allowed to explain only the gist of the conversation with Lavelle.
 {¶ 168} Were now argues that the statement by Lavelle was admissible as an exception to the hearsay rules. He claims it was an admission against Lavelle's penal interest under Evid.R. 804(B)(3).
 {¶ 169} The general rule is that hearsay is not admissible.[42] But a statement made against the declarant's interest, such as an incriminating statement, is admissible, as long as the declarant isunavailable as a witness.[43]
 {¶ 170} There is nothing in the record to explain why Lavelle would not have been available to testify at Were's trial. In fact, the transcript shows that when the defense proffered Lavelle's statement for the record, the prosecutor stated, "Judge, Lavelle is up at Warren right now. I could have him down here at 1 o'clock." Given that Lavelle was available as a witness, his statement to Jefferson was not admissible as a statement against interest.
 {¶ 171} In addition, as the state points out, virtually all the details of Lavelle's conversation with Jefferson were elicited in Jefferson's testimony anyway. Therefore, little or no prejudice would have resulted if the exclusion of the statement had been improper.
 {¶ 172} Accordingly, we overrule Were's twentieth assignment of error.
 XIV. Jury Question and Instructions {¶ 173} In his twenty-first assignment of error, Were argues that the trial court incorrectly answered a question from the jury during the jury's deliberations.
 {¶ 174} During the guilt-phase deliberations, the jury wrote the following question to the court: "Our question is about inference. Inference was discussed under the `aggravated murder of Vallandingham during the kidnapping of Vallandingham,' under the section that explains and discusses purpose. (It was only under `purpose' that inference was discussed.) Can we infer/use inference for all of the charges and apply inference to any charge, or to any definition. And use inference at any time to a decision or verdict."
 {¶ 175} The court responded to the jury, "You have my instructions in writing, and if you want to look at them, at the beginning of the instructions, I told you that evidence may be of two kinds; direct or circumstantial or a combination of the two." The court then explained what direct evidence and circumstantial evidence were.
 {¶ 176} The court continued, "So you may reasonably infer, if you care to do so, all of the evidence in this trial, all of the evidence in the trial. But if you do make that inference, the inference that you end up with must be established beyond a reasonable doubt. But, yes, the answer to your question is, can we infer/use inference for all of the charges and apply inference to any charge and any definition and use inference at any time to come to a decision or verdict? The answer is yes." This was the correct response — to refer the jury to the written instructions and to further explain in different language.
 {¶ 177} At trial, Were did not object to the court again telling the jury the definitions of circumstantial and direct evidence. Were objected to an instruction that the jury could "use an inference on the aggravated murder charge."
 {¶ 178} Were apparently now objects to the portion of the original jury instruction that stated "the purpose with which a person does something may be inferred by you from the manner in which it was done, the means or the weapon, if any, that was used, and all of the other facts and circumstances. However, I can tell you that if a wound is inflicted upon a person with a deadly weapon in a manner calculated to destroy life, the intent to cause death may be inferred by you. However, you are never required to make that inference. Whether you do or not is up to you."
 {¶ 179} Were argues that he was not the "hands-on" killer of Vallandingham. He claims that the court should not have instructed the jury that it was permitted to infer his purpose from the conduct of the "hands-on" killer.
 {¶ 180} But the court did not instruct the jury to infer Were's purpose from someone else's conduct. The court correctly told the jury that it could infer Were's purpose and intent from the weapon or any other fact and circumstance of the killing. The Ohio Supreme Court has stated, "Intent may be inferred from the circumstances surrounding the crime."[44]
 {¶ 181} The trial court also clearly stated that it was optional whether the jury chose to use inference. There was nothing in the court's instruction that could have reasonably been understood to relieve the state of its burden of persuasion on an element of the offense.[45] In addition, the court's statement concerning the use of inference to establish purpose was taken almost verbatim from the Ohio Jury Instructions.[46]
 {¶ 182} Therefore, we overrule Were's twenty-first assignment of error.
 {¶ 183} In his twenty-second assignment of error, Were claims that the trial court failed to instruct the jury on the law of aiding and abetting and complicity. Our review of the record reveals that the trial court did not make such an error.
 {¶ 184} In the jury instructions, the court stated, "An individual is an accomplice if he aids, if he supports, if he assists, if he encourages, if he cooperates with, if he advises, or if he incites, urges, the principal offender in the commission of the crime; and also, if he shares the criminal intent of the principal. However, mere association with the principal or presence at the scene of the crime, that is not enough. Rather, the State must establish that this defendant took some affirmative action to assist, encourage, or participate in the crime by some act of his, by some word of his, or by some gesture of his. Participation with a criminal intent may be inferred by you from the defendant's action, by the defendant's presence, by the defendant's companionship and conduct, either before or after the commission of the particular offense involved.
 {¶ 185} "Therefore, to prove complicity, the State must prove beyond a reasonable doubt, one, that an act or acts on the part of Mr. Were contributed to the aggravated murder or the kidnapping of Vallandingham; and, two, that there was a specific intent on the part of Mr. Were to aid in that aggravated murder and the kidnapping of Vallandingham. Now this theory of law of complicity, aiding and abetting, I want you to remember that, because that is the essence of what the State of Ohio claims Mr. Were did."
 {¶ 186} Because there was nothing improper about the court's jury instructions, we overrule Were's twenty-second assignment of error.
 XV. Ineffective Assistance of Counsel {¶ 187} In his twenty-fourth and final assignment of error, Were argues that he received ineffective assistance of counsel.
 {¶ 188} To establish ineffective assistance of counsel, Were must demonstrate that his counsel's performance fell below an objective standard of reasonable competence, and that there was a reasonable probability that, but for such deficiency, the outcome of the trial would have been different.[47] Judicial scrutiny of counsel's performance must be highly deferential.[48] A court must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance.[49]
 {¶ 189} Were has apparently filed his complaints about ineffective assistance of counsel directly with the Ohio Supreme Court. In the papers he filed, Were alleges that his appellate counsel refused to include instances of his trial counsel's wrongdoing in his appeal. He claims that his appellate counsel was paid off by his trial counsel to cover up both trial counsel's and the state's wrongdoing during his trial. But Were offers no proof to support this claim.
 {¶ 190} More specifically, Were claims that his trial counsel refused to address the fact that his indictment was improper. But included in the papers Were filed are letters to Were from his trial counsel explaining that she had investigated his indictment as he had wished and had found no problems with it.
 {¶ 191} Were also complains that his trial attorneys did not "raise the issue" that he was sent to a different correctional facility for a 30-day observation as part of his competency evaluation. But, again, a letter to Were from his trial counsel discussed the issue. Were's counsel told him that because he had refused to talk to any mental-health professionals, the court's only option was to order Were to be observed as closely as possible to help with the competency determination. His trial counsel told him that if he did not want to be observed and would be willing to cooperate with a mental-health professional, she would ask the court to grant an independent evaluation.
 {¶ 192} Were further complains that he had wanted other witnesses at his competency hearing. These witnesses included John Mackey, his first trial attorney, and Jacalyn McCullough, his prison teacher. But the record shows that Were's counsel did present both of these witnesses at Were's competency hearing.
 {¶ 193} Were lists other complaints, but nothing in Were's letter to the Supreme Court demonstrates that his trial counsel's performance fell below an objective standard of reasonable competence. In addition, Were has failed to demonstrate how he was prejudiced by any of the alleged deficiencies.
 {¶ 194} We conclude that Were has failed to show that he received ineffective assistance of counsel at his trial. Therefore, we overrule his twenty-fourth assignment of error.
 {¶ 195} Because we have overruled each of Were's assignments of error, we affirm the trial court's judgment and sentence.
Judgment affirmed.
Hildebrandt, P.J., and Sundermann, J., concur.
[1] State v. Were, 94 Ohio St.3d 173, 2002-Ohio-481, 761 N.E.2d 591.
[2] Atkins v. Virginia (2002), 536 U.S. 304, 122 S.Ct. 2242.
[3] State v. Lott, 97 Ohio St.3d 303, 2002-Ohio-6625, 779 N.E.2d 1011.
[4] Id. at ¶ 12.
[5] Id. at ¶ 21.
[6] Id. at ¶ 18.
[7] Blakely v. Washington (2004), ___ U.S. ___, 124 S.Ct. 2531.
[8] See State v. Hicks (1989), 43 Ohio St.3d 72, 79, 538 N.E.2d 1030;State v. Williams (1986), 23 Ohio St.3d 16, 19, 490 N.E.2d 906.
[9] See State v. Dickerson (1989), 45 Ohio St.3d 206, 210,543 N.E.2d 1250.
[10] R.C. 2929.04(C).
[11] See State v. Were, 94 Ohio St.3d 173, 174, 2002-Ohio-481,761 N.E.2d 591.
[12] Id.
[13] See State v. Hicks (1989), 43 Ohio St.3d 72, 79, 538 N.E.2d 1030;State v. Williams (1986), 23 Ohio St.3d 16, 19, 490 N.E.2d 906.
[14] See State v. Lamar, 95 Ohio St.3d 181, 2002-Ohio-2128,767 N.E.2d 166, at ¶ 121; State v. Smith (1984), 14 Ohio St.3d 13, 14,470 N.E.2d 883.
[15] See State v. Skatzes, 104 Ohio St.3d 195, 2004-Ohio-6391,819 N.E.2d 215, at ¶ 181, quoting Smith v. Phillips (1982), 455 U.S. 209,219, 102 S.Ct. 940.
[16] See State v. Treesh, 90 Ohio St.3d 460, 464, 2001-Ohio-4,739 N.E.2d 749.
[17] See State v. Gumm, 73 Ohio St.3d 413, 1995-Ohio-24, 653 N.E.2d 253, syllabus.
[18] See State v. Wogenstahl, 75 Ohio St.3d 344, 1996-Ohio-219,662 N.E.2d 311, paragraph two of the syllabus.
[19] See State v. Gumm, supra, syllabus.
[20] See State v. Steffen (1987), 31 Ohio St.3d 111, 509 N.E.2d 383.
[21] Id. at paragraph one of the syllabus.
[22] See State v. Robb, 88 Ohio St.3d 59, 86, 2000-Ohio-275,723 N.E.2d 1019; State v. LaMar, 95 Ohio St.3d 181, 2002-Ohio-2128,767 N.E.2d 166, at ¶ 23; State v. Hoffner, 102 Ohio St.3d 358,2004-Ohio-3430, 811 N.E.2d 48, at ¶ 87; State v. Mink, 101 Ohio St.3d 350,2004-Ohio-1580, 805 N.E.2d 1064, at ¶ 110.
[23] See State v. Skatzes, supra, at ¶ 176.
[24] See State v. Beuke (1988), 38 Ohio St.3d 29, 38-39, 526 N.E.2d 274. See, also, State v. Steffen, supra, at 125-126; State v. Brown (1988),38 Ohio St.3d 305, 320-321, 528 N.E.2d 523.
[25] See State v. Wogenstahl, supra, at 355-356.
[26] See State v. Wogenstahl, supra, paragraph one of the syllabus.
[27] Id. at 355.
[28] See State v. Ahmed, 103 Ohio St.3d 27, 2004-Ohio-4190,813 N.E.2d 637, at ¶ 93.
[29] See State v. Sanders, 92 Ohio St.3d 245, 254, 2001-Ohio-189,750 N.E.2d 90; State v. Skatzes, supra, at ¶ 134.
[30] See State v. Thompkins, 78 Ohio St.3d 380, 386, 1997-Ohio-52,678 N.E.2d 541.
[31] Id.
[32] See State v. Jenks (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.
[33] See State v. Thompkins, supra, at 387.
[34] See id.; State v. Martin (1983), 20 Ohio App.3d 172, 175,485 N.E.2d 717.
[35] See State v. Martin, supra.
[36] See State v. Robb, supra, at 65-68.
[37] Id. at 66.
[38] Section 2510(2), Title 18, U.S.Code.
[39] See State v. Robb, supra, at 67.
[40] See State v. Waddy (1992), 63 Ohio St.3d 424, 445, 588 N.E.2d 819.
[41] See State v. Crawford (1996), 117 Ohio App.3d 370, 380,690 N.E.2d 910 (Painter, J., concurring); see, also, State v. Miller, 1st Dist. No. C-010543, 2002-Ohio-3296, at ¶ 8; In re Garrett (July 31, 1996), 1st Dist. No. C-950243; State v. Lansaw (Feb. 5, 1999), 1st Dist. No. C-980067.
[42] Evid.R. 802.
[43] Evid.R. 804(B)(3).
[44] See State v. Herring, 94 Ohio St.3d 246, 266, 2002-Ohio-796,762 N.E.2d 940.
[45] See State v. Gross, 97 Ohio St.3d 121, 2002-Ohio-5524,776 N.E.2d 1061, at ¶ 102.
[46] 4 Ohio Jury Instructions (2004), Section 503.01.
[47] See Strickland v. Washington (1984), 466 U.S. 668, 687,104 S.Ct. 2052; State v. Bradley (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraphs two and three of the syllabus.
[48] See Strickland v. Washington, supra, at 689; State v. Bradley,
supra, at 142.
[49] Id.