DECISION.
{¶ 1} In 2003, James Were was convicted of one count of kidnapping and two counts of aggravated murder, for which he was sentenced to the death penalty. In 2005, we affirmed Were's conviction and sentence.[1]
 {¶ 2} On remand from the Ohio Supreme Court, we must address several issues. First, we consider supplements made to the record by Were. The supplements are a transcript of an afternoon session during the penalty phase of his trial and questionnaires completed by the prospective jurors. Second, we conduct an independent review of the death sentence as mandated by R.C.2929.05(A).
 {¶ 3} We reach no new conclusions and affirm.
 I. Prison Riot {¶ 4} In April 1993, Were was a participant in an inmate riot at the Southern Ohio Correctional Facility in Lucasville. On the fifth day of the eleven-day riot, inmates killed Corrections Officer Robert Vallandingham.
 {¶ 5} At Were's trial, the state presented nine witnesses and several "tunnel tapes," which were audio recordings secretly made of the inmates during the riot. Inmates testified that Were and several others took Vallandingham hostage shortly after the riot began. Roger Snodgrass, an inmate, testified that Were was one of the leaders of the Muslim gang in the prison and was considered to be one of the "hardliners" who wanted to kill a corrections officer to show that the inmates were serious. According to Snodgrass, Were voted, along with the other gang leaders, to kill Vallandingham. Sherman Simms, another inmate, testified that he saw Were supervise two other inmates as they strangled Vallandingham.
 {¶ 6} The tunnel tapes presented by the state revealed some of Were's conversations during the riot. On the morning that Vallandingham was killed, Were and others discussed killing one of the prison guards. Were described himself as a hardliner and urged the others to be firmer in the negotiations. Were said, "We give a certain time, a certain time. If it's not on in a certain time, that's when a body goes out."
 {¶ 7} On a tunnel tape recorded several days after Vallandingham's death, Were argued to other inmate leaders that the hardliners should control the negotiations. Were said, "They trust the hardliner because that is when they sent our stuff in cause they seen we was not bullshitting. I am putting it just like this (inaudible) now if we have to throw another body, it will let people know the hardliners will put their foot down and (inaudible) do we have to, no, I don't want to kill another guard. Do you know why, cause what I think. I don't give a damn you understand if some of the hostages die slow, or die at all, if I have to die, or we have to die, so I feel then if I cut off a man's fingers, I will cut the man's hand off and go out there and say now, I am going to let you know we ain't interested in killing your hostages. They'll die slow, since you all want to play games."
 II. Verdict and Penalty Phase {¶ 8} The jury returned its guilty verdict for aggravated murder with two specifications. First, the jury found that Were had committed aggravated murder purposely and with prior calculation and design while he was a prisoner in a detention facility. Second, the jury found that Were had committed aggravated murder purposely and with prior calculation and design during a kidnapping. These specifications, found beyond a reasonable doubt, served as the aggravating factors in the penalty phase.
 {¶ 9} In mitigation, Were presented evidence that he was mentally retarded. Were introduced the testimony of Jacalyn McCullough, a prison teacher with a special-education background who had worked with Were while he was incarcerated. McCullough testified that Were functioned academically at a second- or third-grade level and that he had trouble comprehending and retaining abstract concepts. She further testified that she believed, based on Were's comprehension and reading ability, that in a normal school setting he would have been a special-education student. She also believed that he would have been considered developmentally handicapped.
 {¶ 10} Were also called Dr. David Hammer, a psychologist and expert on mental retardation. Hammer stated the three-part definition of mental retardation. Hammer explained that, in general, an IQ score around 70 qualified a person as mentally retarded. Hammer testified that Were had taken two IQ tests as a child. When he was seven, Were scored a 69. When he was twelve, Were again scored a 69. Hammer testified that, based on McCullough's testimony, he thought that Were had sub-average ability in several adaptive behaviors. Hammer testified that, in his opinion, Were was mildly mentally retarded.
 {¶ 11} Dr. Timothy Rheinscheld, a clinical psychologist with a specialization in mental retardation, also testified on Were's behalf. Rheinscheld testified that, in his opinion, Were was mentally retarded. Rheinscheld testified that his opinion was based on the two IQ scores of 69 measured before Were was 18. He also based his opinion on deficits in Were's adaptive behavior as revealed by McCullough's testimony and by Were's prison record.
 {¶ 12} On cross-examination, both Hammer and Rheinscheld testified that the type of IQ test that Were took as a child was the Stanford-Binet. Both testified that the Wechsler test was the current standard IQ test. Both acknowledged that, on the Wechsler test, a score below 70 was considered mentally retarded, but that on the Stanford-Binet test, a score below 68 was considered mentally retarded. Both also acknowledged that claims of cultural bias had been made against the IQ tests administered when Were was a child. These charges had led to changes in the tests and to the adoption of the adaptive-behavior aspects of the mental-retardation definition.
 {¶ 13} The state presented no evidence concerning Were's alleged mental retardation.
 {¶ 14} Were also introduced as a mitigating factor that he was not the principal offender, that is, the actual killer of Vallandingham. A final consideration offered in mitigation was any other factor that weighed in favor of a sentence other than death.
 III. Supplements to the Record {¶ 15} Were's first supplement to the record is the transcript of an afternoon session during the penalty phase. Specifically, it is the testimony of Danny Grant, an inmate who was incarcerated with Were for about four or five months. Were offered Grant's testimony to bolster Were's claim of mental retardation.
 {¶ 16} Grant testified that he helped Were to understand certain legal papers and personal letters. According to Grant, Were had trouble understanding simple words and often still did not understand them after repeated explanations. Grant also testified that he would draft Were's legal motions, and that Were would simply copy the motions in his own handwriting.
 {¶ 17} Grant had previously testified at Were's competency hearing. Grant's testimony at the competency hearing, which was a part of the record that this court reviewed in Were's direct appeal, was essentially the same as his testimony during the penalty phase of the trial. Grant testified both times that Were had difficulty understanding things, even with repeated explanations, and that he had helped Were by drafting legal motions and allowing Were to copy them.
 {¶ 18} In his motion to supplement the record, Were suggested that the additional mitigation testimony from Grant would support his fifth and sixth assignments of error raised in his direct appeal. In his fifth assignment of error, Were argued that the evidence in the penalty phase established that he was mentally retarded, and that he could not therefore receive the death penalty. In his sixth assignment of error, he claimed that the aggravating circumstances did not outweigh the mitigating factors beyond a reasonable doubt.
 {¶ 19} After viewing the record with the supplemental testimony, we still conclude that the evidence presented by Were in the penalty phase did not establish that he was mentally retarded. Similarly, the supplemental testimony does not lead us to a different conclusion regarding Were's sixth assignment of error. We determine that the aggravating circumstances outweighed the mitigating factors beyond a reasonable doubt. Therefore, we overrule Were's fifth and sixth assignments of error.
 {¶ 20} The second supplement to the record on remand is the questionnaires completed by the prospective jurors. Were has not advanced a claim that an error occurred during his trial involving the jury questionnaires, but he has apparently submitted them to ensure a complete record. After reviewing the jury questionnaires, we find no reason why our previous decisions on any of Were's assignments of error should be disturbed.
 {¶ 21} Because we have overruled all of Were's assignments of error, we affirm the trial court's judgment and sentence subject to our independent review of the death penalty.
 III. Independent Review {¶ 22} Having considered Were's assignments of error, we must now review and independently weigh all the facts and other evidence disclosed in the record in this case and consider the offense and the offender to determine whether the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors, and whether the sentence of death was appropriate.[2]
 {¶ 23} In determining whether the sentence of death was appropriate, we must consider whether the sentence was excessive or disproportionate to the penalty imposed in similar cases.[3] We must also review all the facts and evidence and determine whether the evidence supports the aggravating circumstances the jury found the offender guilty of committing, and also whether the sentencing court properly weighed the aggravating circumstances the offender was found guilty of committing and the mitigating factors.[4] Finally, we should affirm a sentence of death only if the record persuades us that the aggravating circumstances outweigh the mitigating factors and that the death sentence was the appropriate sentence.[5]
 {¶ 24} We have already set forth the facts surrounding the kidnapping and murder of Vallandingham. The jury found Were guilty of aggravated murder with two specifications. First, the jury found that Were had committed aggravated murder purposely and with prior calculation and design while he was a prisoner in a detention facility. Second, the jury found that Were had committed aggravated murder purposely and with prior calculation and design during a kidnapping. These specifications, found beyond a reasonable doubt, served as the aggravating factors in the penalty phase.
 {¶ 25} In mitigation, as detailed above, Were presented evidence of his alleged mental retardation. Were offered the testimony of Jacalyn McCullough, his prison teacher, and Danny Grant, a fellow inmate, who both claimed that Were had limited intellectual functioning. Were also offered the testimony of two psychologists, Dr. David Hammer and Dr. Timothy Rheinscheld, who opined that Were was mentally retarded. Were further argued that he was not the actual killer of Vallandingham. In addition, another consideration presented in mitigation was any other factor that weighed in favor of a sentence other than death.
 {¶ 26} We conclude that while Were's limited intellectual abilities are entitled to some weight in mitigation, the evidence produced in the trial did not establish that Were was mentally retarded. Furthermore, evidence of Were's leadership and decision-making during the riot undermines his claim of limited intellectual functioning.
 {¶ 27} Evidence at trial established that Were was a leader in the Muslim gang and a participant in the kidnapping and the decision to kill Vallandingham. Were helped remove Vallandingham from a locked bathroom at the start of the riot. Were voted in a meeting of gang leaders to kill a guard. And Were was physically present and supervised the strangulation of Vallandingham. And while Were was not the principal offender, that is, the actual killer of Vallandingham, he was one of the leaders who decided upon, planned, and supervised the murder.
 {¶ 28} After independently weighing all the facts and evidence in the record, we see nothing in the nature and circumstances of the offense, in the history, character, and background of Were, or in the other mitigation factors upon which Were relied below to dissuade us from our conclusion that the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt.
 {¶ 29} In determining whether the sentence of death was appropriate, we must decide whether the evidence supports the aggravating circumstances the trial jury found Were guilty of committing, and also whether the sentencing court properly weighed Were's aggravating circumstances and mitigating factors.
 {¶ 30} We conclude that the evidence at trial supports that Were committed aggravated murder purposely and with prior calculation and design while he was a prisoner in a detention facility and that he committed aggravated murder purposely and with prior calculation and design during a kidnapping.
 {¶ 31} As for the trial court properly weighing the aggravating circumstances against Were's mitigating factors, we note that the trial court made a separate entry of specific findings. The trial court outlined and discussed the aggravating circumstances and mitigating factors and concluded that the aggravating circumstances Were was found guilty of committing outweighed the mitigating factors beyond a reasonable doubt. We conclude that the trial court properly weighed the aggravating circumstances and mitigating factors.
 {¶ 32} We must next consider whether the sentence was excessive or disproportionate to the penalty imposed in similar cases. The Ohio Supreme Court has held that, for the proportionality review required by R.C. 2929.05(A), "a court of appeals need only compare the case before it with other cases actually passed on by that court to determine whether the death sentence is excessive or disproportionate."[6] A review of cases from this court leads us to conclude that Were's death sentence was not excessive and was not disproportionate.[7]
 {¶ 33} Therefore, we conclude that Were's death sentence was appropriate.
 {¶ 34} Having conducted our independent review of Were's death sentence, we affirm the trial court's judgment.
Judgment affirmed.
Hildebrandt, P.J., and Sundermann, J., concur.
[1] See State v. Were, 1st Dist. No. C-030485,2005-Ohio-376.
[2] R.C. 2929.05(A).
[3] Id.
[4] Id.
[5] Id.
[6] State v. Steffen (1987), 31 Ohio St.3d 111, 124,509 N.E.2d 383.
[7] See, e.g., State v. Sanders (May 1, 1998), 1st Dist. No. C-960253; State v. Fautenberry (Feb. 9, 1994), 1st Dist. No. C-920734; State v. Moore (June 26, 1996), 1st Dist. No. C-950009; State v. Ballew (Aug. 2, 1995), 1st Dist. No. C-920576; and State v. Bies (Mar. 30, 1994), 1st Dist. No. C9-20841.