DECISION.
{¶ 1} Petitioner-appellant Ralph Lynch presents a single assignment of error challenging the Hamilton County Common Pleas Court's judgment denying his postconviction petition seeking relief from his death sentence because he was mentally retarded. We affirm.
 {¶ 2} Lynch was convicted in 1999 of aggravated murder and sentenced to death. In 2002 the United States Supreme Court ruled in Atkins v. Virginia[1] that executing a mentally retarded person violates the proscription against cruel and unusual punishment contained in the Eighth Amendment to the United States Constitution. In 2003, Lynch presented an Atkins
claim in a postconviction petition. Following a hearing, the common pleas court denied the petition.
 I. The Mental-Retardation Criteria {¶ 3} In advancing an Atkins claim, the defendant bears the burden of proving by a preponderance of the evidence that (1) he suffers from "significantly subaverage intellectual functioning," (2) he has experienced "significant limitations in two or more adaptive skills, such as communication, self-care, and self-direction," and (3) the manifestations of mental retardation appeared before the age of 18.[2]
 {¶ 4} At the hearing on Lynch's Atkins claim, Lynch and the state each presented expert opinion testimony by a clinical psychologist. Lynch's expert concluded that Lynch was mentally retarded, while the state's expert concluded that he was not. Based on the evidence adduced at the hearing, the trial court concluded that Lynch had failed to prove his claim.
 A. Significantly Subaverage Intellectual Functioning {¶ 5} The Ohio Supreme Court has cautioned that an IQ test score is merely one measure of intellectual functioning that "alone [is] not sufficient to make a final determination on [the mental-retardation] issue."[3] Nevertheless, the court has declared that a full-scale IQ score above 70 gives rise to "a rebuttable presumption that a defendant [is] not mentally retarded."[4]
 {¶ 6} On an IQ test in 1999, after he had been incarcerated for about a year awaiting trial, Lynch received a full-scale score of 72. Thus, Lynch was presumptively not mentally retarded.
 {¶ 7} Lynch attempted to rebut that presumption with the testimony of Dr. Timothy L. Rheinscheld, a mental-retardation specialist. Dr. Rheinscheld testified that Lynch's IQ score should be adjusted by a standard error of measurement of plus or minus five, to produce a range between 66 and 77. And he noted that Lynch had scored significantly below average on the arithmetic subtest.
 {¶ 8} The experts testified to other matters probative of Lynch's intellectual functioning. Lynch had lived alone for 18 years and had worked for the same trash-collection company for 19 years, repairing tires and providing roadside service and general labor. His work records showed that he had been a productive employee and had been dependable in his attendance. His friends and coworkers had considered him "slow," and he had difficulty reading. But he had a good memory. And he had once driven alone from Ohio to Oregon. Over the years, Lynch had relied on friends and a credit counselor to help him with matters such as managing his money, maintaining his car, and making doctors' appointments. He had also accumulated significant credit-card and loan debt and had once been compelled to declare bankruptcy.
 {¶ 9} Dr. Rheinscheld conducted a three-hour clinical interview with Lynch, and he reviewed various documents. He testified that, although Lynch had performed his job productively, he had worked best under direct supervision at a job that a mildly mentally retarded person could do. Dr. Rheinscheld stated that mildly mentally retarded people commonly lived independently, and that while Lynch had lived alone, others had helped him manage many routine activities. On cross-examination, Dr. Rheinscheld conceded that few mildly mentally retarded people could match Lynch's efforts to conceal and to avoid responsibility for his crime. But he ultimately concluded that Lynch "function[ed] in the [mildly] mentally retarded range" of intelligence.
 {¶ 10} The state's expert, Dr. W. Michael Nelson, disagreed. He conceded that Lynch's IQ score should have been adjusted by a standard error of measurement of plus or minus five, and that the adjustment positioned Lynch in the "borderline" range of intelligence. But he concluded, based on Lynch's IQ score and the facts revealed in the substantial documentation submitted in the case, that Lynch was "not * * * functioning in the range of mental retardation."
 {¶ 11} The trial court concurred with Dr. Nelson. The court found that Lynch's full-scale IQ score of 72 gave rise to the presumption that he was not mentally retarded. But the court accepted that applying the standard error of measurement placed his IQ in a range between 66 and 77. The court acknowledged Lynch's financial difficulties, the perception that he was "slow," and his reading limitations. But the court noted that he had, for a substantial number of years, lived independently and held the same job, that he had been a dependable worker with excellent attendance, that he had a good memory, and that he had successfully planned, budgeted for, and completed a solo cross-country trip. From this, the court concluded that Lynch had failed to prove significant subaverage intellectual functioning.
 B. Significant Limitations in Adaptive Skills {¶ 12} Much of the evidence probative of Lynch's intellectual functioning was also probative of his adaptive skills. Dr. Rheinscheld's clinical interview with Lynch included a test designed to measure adaptive behavior. And he again cited Lynch's need for direct supervision at work, his need for assistance by others in managing his routine activities, and his financial difficulties. Dr. Rheinscheld conceded on cross-examination that Lynch's adaptive skills could also have been adversely affected by mental illness or his cultural environment. And he acknowledged that Lynch had had few previous contacts with the criminal justice system and few disciplinary problems at work or in prison. But he posited that a structured environment, rather than fully developed adaptive skills, accounted for the paucity of Lynch's rule infractions. Based on the interview and the documents submitted in the case, Dr. Rheinscheld found "significant" weaknesses in Lynch's "social skills," or ability to obey the law, and in his "functional academics," or ability to manage money.
 {¶ 13} The trial court again agreed with Dr. Nelson that the record did not support Dr. Rheinscheld's conclusion. The court noted Lynch's limited prior contacts with the law and his ability to function well in prison. And the court found that the limitations in Lynch's ability to manage money were not significant. Thus, the court concluded that Lynch had failed to prove significant limitations in his adaptive skills.
 C. Onset Before Age 18 {¶ 14} Evidence that Lynch had manifested mental retardation before the age of 18 was scant. A school report classified Lynch as mentally retarded. But he did not take an IQ test before the age of 18. He performed poorly in school, was placed in special-education classes when he was fifteen, and eventually dropped out. On this evidence, Dr. Rheinscheld concluded that Lynch's mental retardation had manifested itself before the age of 18.
 {¶ 15} The trial court characterized the evidence on this criterion as "sparse." And the court expressly declined to make a finding, because its conclusion that Lynch was not mentally retarded had rendered the criterion "irrelevant."
 II. We Affirm {¶ 16} An appellate court will not reverse a trial court's determination of the issue of mental retardation if the determination was supported by reliable, credible evidence.[5] We conclude that reliable, credible evidence supported the trial court's determination that Lynch had not proved by a preponderance of the evidence that he was mentally retarded. We, therefore, overrule the assignment of error and affirm the trial court's judgment.
Judgment affirmed.
Hildebrandt, P.J., concurs.
(Judge Rupert A. Doan was a member of the panel, but diedbefore the release of this decision.)
[1] (2002), 536 U.S. 304, 122 S.Ct. 2242.
[2] State v. Lott, 97 Ohio St.3d 303, 2002 — Ohio-6625,779 N.E.2d 1011, at ¶ 12.
[3] State v. Lott, supra, at ¶ 12.
[4] Id.
[5] State v. Were (Feb. 4, 2005), 1st Dist. No. C-030485,2005-Ohio-376.