The STATE of Ohio, Appellant and Cross–Appellee,

v.

GUMM, Appellee and Cross–Appellant.

[Cite as *State v. Gumm*, 169 Ohio App.3d 650, 2006-Ohio-6451.]

Court of Appeals of Ohio,
First District, Hamilton County.

Nos. C–050647, C–050704 and C–050752.

Decided Dec. 8, 2006.

Lawrence J. Greger and Kathleen McGarry, for appellee and cross-appellant.

Joseph T. Deters, Hamilton County Prosecuting Attorney, and William E. Breyer, Assistant Prosecuting Attorney, for appellant and cross-appellee.

HILDEBRANDT, Presiding Judge.

{¶ 1} The state of Ohio appeals the Hamilton County Common Pleas Court's judgment granting Darryl Gumm's postconviction claim seeking relief from his death sentence on the ground that he is mentally retarded. In his cross-appeal, Gumm challenges the denial of the balance of his postconviction claims. We affirm the court's judgment.

{¶ 2} In 1992, Gumm was convicted of aggravated murder and was sentenced to death. In 2002, the United States Supreme Court ruled in *Atkins v. Virginia* [1] that executing a mentally retarded person violates the proscription against cruel and unusual punishment contained in the Eighth Amendment to the United States Constitution. In December of that year, the Ohio Supreme Court in *State v. Lott* [2] established procedures and substantive standards for adjudicating a capital defendant's *Atkins* claim.

{¶ 3} The court in *Lott* recognized that a defendant who had been sentenced to death before the *Lott* decision had not been afforded a full and fair opportunity to litigate his claim of mental retardation as a complete bar to his death sentence. [3] The court provided that opportunity by exempting that defendant from the time strictures of R.C. 2953.21 and the jurisdictional requirements of R.C. 2953.23, and by affording him 180 days from the date of its decision to present his *Atkins* claim in a postconviction petition. [4]

---

1. (2002), 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335.

2. 97 Ohio St.3d 303, 2002-Ohio-6625, 779 N.E.2d 1011.

3. Id. at ¶ 20.

4. Id. at ¶ 24.

{¶ 4} In April 2003, Gumm presented his *Atkins* claim in a postconviction petition. He also presented in his petition claims seeking relief from his conviction on an array of non-*Atkins* grounds. Following a hearing, the common pleas court granted Gumm's *Atkins* claim, but denied the balance of his claims. These appeals followed.

## I. Gumm's Atkins Claim

{¶ 5} The state presents on appeal a single assignment of error challenging the common pleas court's determination that Gumm is mentally retarded. This challenge is unavailing.

### A. The Mental–Retardation Hearing

{¶ 6} At the hearing on his *Atkins* claim, Gumm presented testimony by two of his sisters, two of his junior high school teachers, and a court-appointed psychologist. His sisters testified that Gumm, during his childhood and adolescence, had been largely neglected by his alcoholic parents. He could neither read nor write, and he would communicate in grunts rather than words. He could not or would not attend to his personal hygiene, and he did not learn to tie his shoes until he was a teenager. His school attendance was sporadic, as he bounced from home to home to institution. He started drinking as a teenager, and alcohol remained a problem for him. He never established his own home, never had a steady job, never obtained a driver's license, and never used public transportation.

{¶ 7} On intelligence-quotient ("IQ") tests administered between 1974 and 1979, Gumm received full-scale scores of 73, 70, and 71. In 1980 and 1981, when Gumm was 15 and 16 years old and living in an orphanage, his junior high school placed him for eighth and ninth grade in a class for students deemed "educable mentally handicapped" and "educable mentally retarded."

{¶ 8} Two of the special-education teachers assigned to the class testified at Gumm's *Atkins* hearing. The teachers portrayed Gumm as a low-functioning student who was memorable because of his "unke[m]pt" appearance and "lost" demeanor. An IQ test administered in 1981 yielded a full-scale score of 79. That and other testing showed that Gumm functioned during those years on a second-to-third-grade educational level. Gumm's teachers found that Gumm could read "a little" and could do simple arithmetic. He could follow simple directions and was able to assist the school's custodians with menial tasks in the cafeteria. He was polite to and cooperative with his teachers and classmates. But his affect was "dull," and his behavior was that of a "loner" and a "follower." And he possessed fewer social skills than his classmates and exhibited notably poor personal hygiene. Based on the deficiencies in his adaptive skills, his under–80 IQ score, and the adverse effects of his intellectual and adaptive deficiencies on

his educational performance, the school classified Gumm as "educable mentally retarded."

{¶ 9} A court-appointed psychologist, Dr. David Alan Ott, qualified by the trial court as a mental-retardation expert, applied similar criteria to conclude that Gumm was mentally retarded. The Ohio Supreme Court in *State v. Lott* provided three criteria for evaluating a capital defendant's claim that he is, in the words of the United States Supreme Court in *Atkins*, "so impaired as to fall within the range of mentally retarded offenders [against] who[se] [execution] there [has emerged] a national consensus." [5] The defendant must demonstrate by a preponderance of the evidence (1) that he suffers from "significantly subaverage intellectual functioning," (2) that he has experienced "significant limitations in two or more adaptive skills, such as communication, self-care, and self-direction," and (3) that these manifestations of mental retardation appeared before the age of 18. [6]

{¶ 10} The court in *Lott* formulated its mental-retardation criteria based upon the clinical definitions of mental retardation provided in 1992 by the American Association of Mental Retardation ("AAMR") and in 2002 by the American Psychiatric Association ("APA") and cited with approval by the Supreme Court in *Atkins*. [7] Both definitions provided these diagnostic criteria for mental retardation: substantial limitations in present functioning, manifested before the age of 18, and characterized by significantly subaverage intellectual functioning coexisting with significant limitations in two of the adaptive skills of communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, health and safety, functional academics, leisure, and work. [8]

{¶ 11} In 2002, the AAMR amended its definition to require a finding of significant deficiencies in one of three categories of adaptive skills: "conceptual," which includes language, money concepts, self-direction, and the functional academic skills of reading and writing; "social," which includes interpersonal relationships, self-esteem, gullibility, naivete, and avoiding victimization; and "practical," which includes work, self-care, health, and safety skills. The AAMR also added in 2002 five assumptions that an examiner must take into account in

---

5. *Atkins v. Virginia*, 536 U.S. at 317, 122 S.Ct. 2242, 153 L.Ed.2d 335.

6. *Lott*, 97 Ohio St.3d 303, 2002-Ohio-6625, 779 N.E.2d 1011, at ¶ 12.

7. *Atkins v. Virginia*, 536 U.S. at 308, 122 S.Ct. 2242, 153 L.Ed.2d 335, fn. 3; *Lott*, 97 Ohio St.3d 303, 2002-Ohio-6625, 779 N.E.2d 1011, at ¶ 12.

8. Am. Assn. of Mental Retardation (9th Ed.1992), Mental Retardation: Definition, Classification, & Systems of Supports 5 Diagnostic and Statistical Manual of Mental Disorders (4th Ed.2000) 41.

diagnosing mental retardation, including the assumption that a mentally retarded person's strengths often coexist with his limitations and the assumption that a mentally retarded person may improve his functioning level with an appropriate system of supports.[9]

{¶ 12} Dr. Ott reviewed the legal standard for mental retardation provided in *Atkins* and *Lott* and the psychological standards provided in 2000 by the APA and in 2002 by the AAMR. He reviewed Gumm's records, conducted a two-and-one-half-hour interview with Gumm, and interviewed Gumm's sisters, a brother, and his two special-education teachers. His examination led him to the opinion that Gumm was "presently mentally retarded."

{¶ 13} Dr. Ott addressed first the adaptive-skills criterion. He found that Gumm had significant deficits in two—the conceptual and the practical—AAMR adaptive-skills categories and in nine of the eleven APA adaptive skills. He noted, for example, that the records of the Ohio Department of Rehabilitation and Corrections ("DRC") indicated that Gumm could not read or write and was functionally illiterate. He found that these deficits in functional academics had first been identified when Gumm was six years old and that they had persisted through his adolescence and his 15 years on death row. Dr. Ott assigned little significance to Gumm's submission, during his imprisonment, of "kites," or written inquiries addressed to prison personnel. He stated that the variety of handwriting on the kites had confirmed to him what the DRC records had noted: that Gumm had relied on staff and fellow inmates to write them for him.

{¶ 14} Dr. Ott also found the record replete with notations concerning Gumm's poor personal hygiene, from early in his school career through his 1992 trial. Dr. Ott's examination of Gumm for his mental-retardation hearing confirmed that the deficits in Gumm's self-care skills had persisted.

{¶ 15} Dr. Ott then addressed the intellectual-functioning criterion. On IQ tests administered to Gumm before the age of 18, he scored 73, 70, 71, and 79. On IQ tests administered in 1992, right before his trial, and in 1994, Gumm received full-scale scores of 70, 67, and 61.

{¶ 16} For purposes of his examination, Dr. Ott disregarded two of Gumm's later scores, because they had been achieved in a group test. He also found the 79 scored in 1981 to be "problematic," coming as it did a mere two years after the 70 scored in 1978 and the 71 scored in 1979. Dr. Ott stated that he had elected not to test Gumm's IQ to aid him in his analysis, because his understanding of "the stability of IQ over time[,] and particularly once one reaches adolescence," led him to expect no dramatic improvement over the intervening years; because

---

9. Am. Assn. of Mental Retardation (10th Ed.2002), *Mental Retardation: Definition, Classification, & Systems of Supports* 1.

a test administered in a restrictive setting like a prison would give an invalid view of an individual's functioning; and because testing conducted after the age of 18 and under Gumm's circumstances would be open to questions concerning Gumm's motivation to do his best. He insisted that historical records and the consistency of those records over time were much more useful to his analysis than the results of a test conducted currently.

{¶ 17} The court in *Lott* cautioned that an IQ test score is merely one measure of intellectual functioning that "alone [is] not sufficient to make a final determination on [the mental-retardation] issue." [10]   Nevertheless, the court declared that a full-scale IQ score above 70 gives rise to "a rebuttable presumption that a defendant [is] not mentally retarded." [11]   Dr. Ott acknowledged the presumption, but criticized it as "inconsistent with the state of the science in terms of AAMR and APA's definition[s]." The APA defines the term "mild mental retardation" as one "typically used to describe people with an IQ level of 50–55 to *approximately* 70." [12]   Dr. Ott testified that the AAMR and the APA require that IQ scores be subjected to a standard error of measurement of plus or minus three to five points. Thus, he asserted, the AAMR and the APA permitted a finding of subaverage intellectual functioning in a person with an IQ score of 73. Dr. Ott concluded that Gumm's IQ test scores from age eight to age 26 were, with the exception of the 1981 score, "very consistent * * * within the same range" and "consistent with mental retardation when one takes into account the standard error of measurement."

{¶ 18} Dr. Ott acknowledged that Gumm's academic deficits had likely been affected by his hearing problem, his unstructured and unsupervised childhood, his school and home environments, and his alcohol abuse. He also considered the APA assumption that a mentally retarded person given an appropriate system of supports could improve his functioning to the point where he is no longer mentally retarded. He acknowledged that Gumm, while in prison, had posed few discipline problems and had maintained a menial job. But he noted that Gumm's deficits had preceded his alcohol abuse. And he concluded that, given the "breadth" of Gumm's deficits, such improvement was unlikely.

{¶ 19} Dr. Ott did not interview prison personnel. He noted that the AAMR requires an examiner to consider an individual's functioning in a community setting. And he asserted that the experience of prison personnel with Gumm in

---

10.   *Lott*, 97 Ohio St.3d 303, 2002-Ohio-6625, 779 N.E.2d 1011, at ¶ 12.

11.   Id.

12.   (Emphasis added.)   Diagnostic & Statistical Manual of Mental Disorders 42–43 (4th Ed.2000)

such a restrictive setting would not have allowed them to extrapolate to provide an accurate view of how Gumm would function in a community setting.

{¶ 20} The state did not produce at the hearing an expert to counter Dr. Ott's expert opinion that Gumm was mentally retarded. It instead presented the testimony of two lay witnesses—a death-row case manager and a death-row corrections officer—in an attempt to show that Gumm presently demonstrated no significant limitations in his adaptive skills.

{¶ 21} The witnesses testified that Gumm interacted well and communicated effectively with others. They noted that he had submitted kites and commissary slips and that he had, until the decision in *Atkins*, attended GED classes. But they acknowledged that the kites bore different handwriting. And they conceded that they did not know who had written the kites or slips, whether Gumm could read or write, or whether he knew how much money he had in his commissary account. And the case worker acknowledged that prison records reflected that, throughout his time in prison, Gumm had continued to be a follower, had continued to manifest "mental deficiencies," and had remained illiterate and thus dependent on the prison staff and fellow inmates for help with his correspondence.

{¶ 22} The witnesses testified that during the recreation hour each day (the one hour when he was not confined to his cell), Gumm watched television or played cards. When he gambled at cards, the witnesses asserted, Gumm knew whether he was winning or losing. At the close of the recreation hour, it was Gumm's job, as the "recreation porter," to straighten the recreation cage. Although the witnesses had heard no complaints, neither could testify about how well Gumm had performed his job.

{¶ 23} The witnesses also stated that Gumm fed, showered, and dressed himself, kept his cell clean, attended "nurse sick call" when necessary, followed the rules, and was mindful of his safety and the safety of others. But they admitted that Gumm's failure to attend to these matters could result in punishment. And the case worker acknowledged that prison records showed that upon his intake in 1992, Gumm had required close supervision for his and others' safety.

## B. The Common Pleas Court's Decision

{¶ 24} Based upon the evidence adduced at the hearing, the common pleas court concluded that Gumm had sustained his burden of proving by a preponderance of the evidence that he is mentally retarded. The court determined that Gumm's IQ scores raised the presumption that he was not mentally retarded. But the court found that Gumm had rebutted the presumption with evidence demonstrating significantly subaverage intellectual functioning and significant

limitations in his social, self-direction, and functional-academics adaptive skills manifested before the age of 18.

{¶ 25} The determination of whether a capital defendant is, by the *Lott* court's definition, mentally retarded presents a factual issue for the trial court.[13] And an appellate court may not reverse the trial court's determination if it was supported by reliable, credible evidence.[14]

{¶ 26} The court below declared the testimony of Gumm's two sisters to be less than credible. But the testimony by Gumm's junior high school teachers that Gumm, in eighth and ninth grade, had functioned on a second- or third-grade level provided ample evidence to support the common pleas court's conclusion that Gumm had, before the age of 18, manifested significantly subaverage intellectual functioning. And Dr. Ott's testimony to Gumm's literacy deficiencies, which the state's witnesses could not effectively counter, supported a finding that those deficiencies had persisted.

{¶ 27} The record is also replete with evidence that Gumm, throughout his life, has experienced significant limitations in the adaptive skills of functional academics, social/interpersonal relationships, self-direction, and self-care. Again, Gumm's teachers and Dr. Ott provided proof of functional illiteracy that the state's witnesses could not controvert. And the testimony of the teachers and Dr. Ott, along with the DRC's records, demonstrated that Gumm had been and had remained a follower with limited social skills and deficits in his personal hygiene.

{¶ 28} The record thus provided reliable, credible, and *unrebutted* evidence to support the common pleas court's conclusion that Gumm was mentally retarded. Although the dissent emphasizes that there was evidence that would support a finding that Gumm is not mentally retarded, it is not an appellate court's function to substitute its judgment for that of the trial court.

{¶ 29} We therefore conclude that the court properly granted Gumm's first postconviction claim. Accordingly, we overrule the state's assignment of error.

## II. Gumm's Non–Atkins Claims

{¶ 30} In his cross-appeal, Gumm advances six assignments of error. We find no merit to any aspect of the challenges presented.

---

13. Id. at ¶ 9.

14. *State v. Were*, 1st Dist. No. C–030485, 2005-Ohio-376, 2005 WL 267671.

### A. Appellee's "Assignment of Error"

{¶ 31} In his first assignment of error, Gumm asserts that credible, reliable evidence supported the common pleas court's determination that he is mentally retarded. Because the court granted Gumm the relief sought in his *Atkins* claim, we view Gumm's first assignment of error as one offered under R.C. 2505.22, in his capacity as the appellee, to prevent a reversal of the court's judgment on this claim. And because we here affirm that aspect of the court's judgment, we need not address the assignment of error.

### B. Involuntary Confession and Ineffective Counsel

{¶ 32} In his remaining assignments of error, Gumm challenges the denial of his third, fifth, eighth, and ninth postconviction claims. In his third, eighth, and ninth claims, he sought relief from his judgment of conviction on the grounds that his confession had been involuntary because he is mentally retarded and because his counsel had been ineffective in preparing for and presenting his defense during the guilt and penalty phases of his trial.

{¶ 33} Gumm was convicted in 1992. The General Assembly amended R.C. 2953.21(A)(2), effective September 21, 1995, to impose time limitations on the filing of a postconviction petition. The amendment afforded a postconviction petitioner who had been convicted before the amendment's effective date a period of one year from the effective date to file his petition.[15] Gumm timely filed his first postconviction petition in 1996. And his 2003 *Atkins* claim was, under the decision in *Lott*, timely filed. But he filed his non-*Atkins* postconviction claims well after the time prescribed by R.C. 2953.21.

{¶ 34} R.C. 2953.23 closely circumscribes the circumstances under which a common pleas court may entertain a tardy postconviction claim. The petitioner must show either that he was unavoidably prevented from discovering the facts upon which his claim depends, or that his claim is predicated upon a new or retrospectively applicable federal or state right recognized by the United States Supreme Court since the time prescribed by R.C. 2953.21 expired. And he must show by clear and convincing evidence that, but for constitutional error at trial, no reasonable factfinder would have found him guilty of the offense of which he was convicted.

{¶ 35} Gumm's third, eighth, and ninth postconviction claims challenged the voluntary nature of his confession and his trial counsel's effectiveness. As to these claims, the record does not demonstrate that Gumm was unavoidably prevented from discovering the facts underlying the claims. Nor does it show

---

**15.** See 146 Ohio Laws, Part IV, 7815, 7823–7824.

that the claims were based upon a new or retrospectively applicable federal or state right recognized by the United States Supreme Court since the time for filing his petition expired. We therefore conclude that the court below properly declined to entertain his third, eighth, and ninth claims.

## C. Undisclosed Evidence

{¶ 36} In his fifth claim, Gumm sought relief from his conviction on the ground that the state had failed to disclose exculpatory evidence in the form of information developed by the police during their investigation. In support of his claim, he asserted that this evidence had been in the hands of the state, and that it had come to light only in the course of discovery conducted in preparing his *Atkins* claim. Thus, Gumm may fairly be said to have been unavoidably prevented from discovering the facts underlying his claim.

{¶ 37} The fair-trial guarantee of the Due Process Clause of the Fourteenth Amendment to the United States Constitution requires the state to disclose to a criminal accused evidence material to the accused's guilt or innocence.[16] Such evidence is "material" only if there is a "reasonable probability" that its disclosure would have changed the outcome of the trial.[17] The determination of whether such a probability exists entails an inquiry not into whether a trial with the undisclosed evidence would have yielded a different verdict, but into whether the evidence, "considered collectively," "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." [18]

{¶ 38} Gumm was convicted of aggravated murder, attempted rape, and kidnapping in connection with the fatal beating of a ten-year-old boy in an abandoned building. The investigating officers testified at trial that in the weeks following the murder, they had had little physical evidence on which to proceed, and their list of potential witnesses and suspects had consisted of approximately 145 people. They turned their attention to Gumm after his sister had reported that Gumm knew his way around the abandoned building where the victim had been found and that he had been in the vicinity of the building on the day of the murder. Gumm subsequently confessed that he had participated in the murder. And the defense, at the hearing on Gumm's motion to suppress, failed to convince the trial court that his confession was involuntary.

---

16. See *Brady v. Maryland* (1963), 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215.

17. See *United States v. Bagley* (1985), 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481.

18. *Kyles v. Whitley* (1995), 514 U.S. 419, 434–436, 115 S.Ct. 1555, 131 L.Ed.2d 490.

{¶ 39} In support of his fifth claim, Gumm offered Crimestopper reports, lead and tip sheets, and investigation notes and summaries memorializing information received and gathered by the police during their investigation. These records showed what the investigating officers stated at Gumm's trial: that the police had initially had few leads and had cast a very wide net to find the killer. The officers inquired about sex offenders known to live in or frequent the neighborhood surrounding the abandoned building where the victim had been found. They followed tips, often based on rumor and second- and third-hand information, concerning individuals who had made incriminating statements or had exhibited suspicious behavior, individuals who had been seen in or around the abandoned building or the surrounding neighborhood, and individuals who had been seen with the victim around the time of the murder. They also obtained information that impeached the victim's brother's credibility and contradicted the state's theory concerning when the murder had occurred.

{¶ 40} From our review of the record, we conclude that the undisclosed evidence, viewed collectively, was not "material" in that it could not "reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict[s]." [19] Therefore, the state's failure to disclose the evidence did not deny Gumm his constitutional right to a fair trial.[20] Moreover, the record will not permit the conclusion that, but for the state's failure to disclose the evidence, no reasonable factfinder would have found him guilty of the offenses of which he was convicted. Thus, Gumm failed to satisfy the R.C. 2953.23 jurisdictional requirement of outcome-determinative constitutional error. We therefore hold that the common pleas court properly declined to entertain his fifth postconviction claim.[21]

{¶ 41} Accordingly, we overrule Gumm's remaining assignments of error. And we affirm the judgment of the court below.

Judgment affirmed.

PAINTER, J., concurs.

HENDON, J., concurs in part and dissents in part.

HENDON, J., concurring in part and dissenting in part.

{¶ 42} I concur with the majority in affirming the common pleas court's dismissal of Gumm's non-*Atkins* claims. But recognizing the gravity of the issue

---

19. See *Kyles v. Whitley*, 514 U.S. at 435, 115 S.Ct. 1555, 131 L.Ed.2d 490.

20. See *Brady v. Maryland*, 373 U.S. at 87, 83 S.Ct. 1194, 10 L.Ed.2d 215.

21. See R.C. 2953.23(A)(1)(b).

in this case, I must respectfully dissent from the majority's opinion upholding the determination that Darryl Gumm successfully rebutted the presumption that he is not now, nor has he ever been, mentally retarded. As a result of the trial court's decision, Gumm has been afforded a complete bar to his death sentence that was imposed in 1992 for the aggravated murder of ten-year-old Aaron Raines.

{¶ 43} The Ohio Supreme Court in *State v. Lott*,[22] interpreting *Atkins v. Virginia*,[23] crafted a postconviction opportunity for death-row defendants to litigate claims of mental retardation, even when a defendant's objective indicia of nonretardation is evidenced by several IQ scores above 70.

{¶ 44} In making its determination, a trial court must first consider whether the defendant has significantly subaverage intellectual functioning. Intellectual functioning is defined by the intelligence quotient ("IQ") obtained by assessment under one or more of the standardized, individually administered intelligence tests. Significantly subaverage intellectual functioning is defined as an IQ of about 70 or below (approximately two standard deviations below the mean). It is here that the trial court initially, in my opinion, erred because Gumm had scored consistently above 70 on IQ tests before the age of 18.

{¶ 45} In considering the first *Lott* prong, the trial court determined that Gumm had met his burden of proving that he had significantly subaverage intellectual functioning. The court explained that "the IQ test administered to Gumm clearly show [sic] that he is two deviations removed from the norm, i.e., 100."

{¶ 46} But this finding was simply not supported by the evidence. Gumm had obtained scores of 73, 70, 71, and 79 on four tests administered before the age of 18. As the trial court noted, the first two scores were obtained by Stanford–Binet tests, which had a standard deviation of 16. The remaining scores were obtained by Wechsler Intelligence Scale tests, which had a standard deviation of 15. On *none* of these tests did Gumm's score indicate that he was two deviations removed from the norm.

{¶ 47} A fifth IQ test was administered to Gumm while he was incarcerated.[24] This was the only test on which Gumm could be said to have tested two deviations from the norm. At the time of the test, Gumm was 26 years old and was just

22. 97 Ohio St.3d 303, 2002-Ohio-6625, 779 N.E.2d 1011.

23. (2002), 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335.

24. According to the defense expert, two other tests administered to Gumm in 1994 while he was in prison (Raven Progressive Mathematics and Beta) were not directly applicable to a diagnosis of his level of intellectual functioning.

weeks away from being tried for capital murder. The defense expert acknowledged that both of these circumstances may have yielded an unreliable IQ score.

{¶ 48} In fact, the expert testified that he did not administer an IQ test in preparation for Gumm's *Atkins* hearing because it would have given an invalid view of Gumm's functioning. In his view, "testing that is conducted after the age of 18 certainly would be open to reasonable question about validity, motivation, about the extent which someone tried their best, given the circumstances of the assessment." In addition, the expert testified, IQ evaluations conducted in restrictive settings such as prisons "are not really valid."

{¶ 49} Moreover, the expert testified that "Gumm's intelligence test scores are consistent with mental retardation *when one takes into account the standard error of measurement.*" But, upon questioning by the court, the expert admitted that the error of measurement went both ways:

{¶ 50} "[Court]: So assuming for the mathematics you are talking about error rate of 3, the 73 test could be either 67 or a 76, right? If we are using plus or minus 3—[.]

{¶ 51} "[Expert]: Plus or minus from 3 from 73 would be 70 to 76, yes. And using the 5 it would be 68 to 78."

{¶ 52} When asked by defense counsel whether he had an opinion whether Gumm would be "on the higher end or the lower end," the expert said, "There would be no way of knowing it. It's a guideline. It can vary depending upon conditions, examiners. There would be no way of doing that."

{¶ 53} As the trial court pointed out, application of the standard error of measurement made it *equally probable* that Gumm's IQ was higher than 70. In fact, the court specifically concluded that Gumm had "failed to prove by a preponderance of the evidence [that] his IQ was 70 or less."

{¶ 54} Accordingly, I believe that the trial court's determination that Gumm successfully rebutted the presumption that he is not mentally retarded was not supported by reliable evidence. Gumm's failure to prove that he had significantly subaverage intellectual functioning, as evidenced by the repeated scores above 70, should have stopped the court's inquiry at that point.

{¶ 55} Moreover, *Lott* requires evidence of *present* retardation. Indeed, the AAMR identifies several assumptions that it deems "essential to the application" of its definition of mental retardation. One assumption is that "[l]imitations in *present functioning* must be considered within the context of community environments typical of the individual's age peer and culture." (Emphasis added.) Another assumption is that "[w ]ith appropriate personalized supports over a sustained period, the *life functioning* of the person with mental retardation *generally will improve.*" (Emphasis added.)

{¶ 56} According to the AAMR, "[a]daptive behavior is the collection of conceptual, social, and practical skills that people have learned so they can function in their everyday lives. Significant limitations in adaptive behavior impact a person's daily life and affect the ability to respond to a particular situation or to the environment."

{¶ 57} Despite the AAMR's emphasis on an individual's present functioning and environment, the trial court simply noted that Gumm had "adapted to his surroundings in the penitentiary." In finding that Gumm had significant limitations in adaptive skills, the court relied on the testimony of teachers who had not seen Gumm since he was in middle school more than 20 years earlier. But their testimony would hardly have been relevant to a determination of whether Gumm is *presently* mentally retarded.

{¶ 58} Relying on the testimony of teachers from 20 years earlier instead of on the testimony of workers from the Ohio Department of Corrections who had present-day contact with Gumm, the trial court concluded that Gumm had overcome the presumption of nonretardation and thus should be spared the ultimate penalty for his crime.

{¶ 59} The trial court stated that it was "keenly aware [that] once a trial court makes a determination of the Defendant's mental retardation status, that decision will not be disturbed on appeal, absent an abuse of discretion." To the contrary, an appellate court will reverse a trial court's determination that a defendant is mentally retarded if the determination is not supported by reliable, credible evidence.[25]

{¶ 60} Here, the trial court determined that Gumm had successfully rebutted the presumption that he was not mentally retarded. But the fact that the court's determination was not supported by reliable and credible evidence supports the opposite finding. I respectfully dissent.

25. *State v. Were,* 1st Dist. No. C–030485, 2005-Ohio-376, 2005 WL 267671.