[Cite as *State v. Deloney*, 2017-Ohio-9282.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-150619 |
| | | TRIAL NO. B-1303726 |
| Plaintiff-Appellant, | : | |
| | | *O P I N I O N.* |
| vs. | : | |
| | | |
| JOHN DELONEY, | : | |
| | | |
| Defendant-Appellee. | : | |

Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Reversed and Cause Remanded

Date of Judgment Entry on Appeal: December 29, 2017

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Ronald W. Springman*, Assistant Prosecuting Attorney, for Plaintiff-Appellant,

*Faulkner & Tepe, LLP, A. Norman Aubin* and *Wilkes R. Ellsworth*, for Defendant-Appellee.

**MOCK, Presiding Judge.**

{¶1} On June 21, 2013, defendant-appellee John Deloney was indicted on one count of aggravated murder with a death-penalty specification and one count of aggravated robbery with a gun specification. The case proceeded for nearly two years while the trial court attempted to determine if Deloney was eligible for the death penalty because of the claim asserted by counsel that he was mentally retarded. The trial court determined that subjecting Deloney to the death penalty would constitute cruel and unusual punishment. *See Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002); *State v. Lott*, 97 Ohio St.3d 303, 2002-Ohio-6625, 779 N.E.2d 1011. The state now appeals, asserting one assignment of error.

{¶2} From the time that counsel for Deloney filed the motion pursuant to *Atkins* and *Lott* claiming that Deloney was not eligible for the death penalty, Deloney and his family refused to cooperate in the prosecution of the motion. In its entry, the trial court spent several pages examining in detail the struggles of numerous attorneys and medical professionals, and its own efforts, to convince Deloney to submit to the required testing. In total, Deloney refused to submit to evaluations by medical professionals during 12 different sessions, six with Dr. Carla Dreyer and six with Dr. David Smith. Additionally, his family members refused to cooperate with the experts in their evaluations Deloney's refusal to comply became such an obstruction that, at one point, Deloney was sent to Summit Behavioral Healthcare for an extended period to determine his competence to stand trial. After doctors determined that he was competent to stand trial, the trial court set a hearing on the *Atkins* motion, deciding to use what evidence the parties had been able to muster without his cooperation.

**The Hearing**

{¶3}   On August 17, 2015, the trial court conducted a hearing on Deloney's motion.  Drs. Smith and Dreyer both submitted reports.  In Smith's report, he noted that he had reviewed some school records, and reports prepared by other medical professionals involved in the case.  But, because of Deloney's failure to cooperate with the evaluation, Smith could not reach a conclusion about whether Deloney had significant limitations in two or more adaptive skills.  Smith wrote that

> The clearest conclusion to be drawn is that under the current circumstances I am unable to give a definitive appraisal about whether Mr. John Deloney has Mental Retardation or Intellectual Disability at this time.  Thus, it is likely that the court will need to proceed regarding his charges.  Should Mr. Deloney be found guilty, then the question might be better answered should he comply with standardized testing, and if at least one other informant is found to give reports of his adaptive functioning.

Dreyer, faced with the same obstacles, reached similar conclusions.  She wrote that

> As the Court is aware, multiple attempts have been made to formally assess the defendant's intellectual and adaptive functioning to determine if he suffers from mental retardation (also known as an intellectual disability).  While he has not cooperated with various assessments, including the undersigned's current assessment attempt, available records were reviewed in relationship to the referral questions.  A discussion of this information is being provided to the Court to assist in determining if the defendant is mentally retarded.  However, given the defendant's lack of cooperation with the evaluation and the absence of current intelligence testing and collateral

3

information from the family related to his childhood functioning, I am unable to state, to a reasonable degree of psychological certainty, if the defendant suffers from mental retardation that would allow the United States Constitution to bar him from receiving the death penalty.

{¶4}   In addition to the reports, both doctors testified at the hearing. Smith, testifying for Deloney, said that he had explained to Deloney that he was there to evaluate him to see if he qualified under *Atkins* as mentally retarded. He said that Deloney seemed to understand, but refused to cooperate with him. Smith also testified that the team at Summit Behavioral Healthcare had reported that, within that structured environment, Deloney did not exhibit any deficient functioning, either in navigating the rules or being able to occupy his time in different areas. But Smith said that standing out in such a structured environment would have been "pretty hard to do."

{¶5}   Smith also reviewed Deloney's records from Cincinnati State Technical and Community College, noting that he had not done well and had needed developmental classes. But in discussing Deloney's experience at Cincinnati State, Smith admitted that he looked at only a single sheet of paper, and that it appeared to be "a snapshot of someone who apparently crashed and burned." But Smith also admitted that he did not know what the requirements of the program were when he made his evaluation of Deloney's performance.

{¶6}   Smith also reviewed Deloney's employment records from Frisch's and Long John Silver's. Deloney had worked at the two restaurants for a period of a few months each. But the records from his employment there were very sparse, containing no information about his job duties or his work performance. Smith noted that the Frisch's records did not give a reason for his termination, and that the

Long John Silver's records indicated only that he was let go because he was "not able to keep up." All he could say about Deloney's work history was that

> [w]ell, he was not able to keep up with the job expectations. They looked like positions within the kitchen. They looked like manual labor positions that many individuals with mild intellectual disability can do quite well. And he was not keeping up was all it said. It didn't have an extensive rationale for it, or what was going on. But that would *show the possibility* that, again, he's not showing independent functioning in a vocational setting.

But, on cross-examination, Smith further conceded that his failure to perform at work could also have been because he was simply unwilling to do the work assigned.

{¶7} Smith spoke at length about the refusal of Deloney to cooperate with the *Atkins* evaluations. Smith agreed with defense counsel that Deloney's unwillingness to cooperate "*could mean* that he's not fully comprehending from a conceptual basis what the charges are and what I guess more importantly the reason his cooperation may be beneficial to him." But he also noted that it "*could be* he's just being oppositional or he's just trying to comply with other things that have been told to him." He said, "I do feel *to some extend that there's certainly the hypothesis* that him not understanding that, if you fail to cooperate, you have negative outcomes potentially that could have been avoided." When asked if someone who stigmatizes the word "retarded" would try to fight being labeled as such, Smith agreed, stating, "[t]hat's not uncommon for them for sure * * * however, if someone would have the sense that that's not valid, they would probably go ahead and show that that's not true by proceeding with an appraisal." He also speculated that "whatever motive he might be coming at, I just got the impression that he felt that if he could come up with some way to find a loophole, that became his biggest hope. That became, even

up to the last moment when I thought at Summit he was going to comply, he still held out as, that's my ticket to freedom."

{¶8} In his conclusions, however, Smith got no closer to being able to give an opinion based on a reasonable degree of psychological certainty, saying only that the supporting evidence "shows *a strong suspicion* that he does have intellectual disabilities." He said that "we don't have sufficient evidence especially on the standardized, I can't definitely say" whether Deloney meets the *Atkins* criteria.

{¶9} Dreyer testified for the state. Dreyer's opinions during her testimony did not vary from her report. She related that Deloney had repeatedly but politely declined to participate with her attempts to evaluate him. Dreyer said that the team at Summit had completed an adaptive behavior assessment and concluded that Deloney was in the average range. Dreyer also testified that Deloney had tested highly for malingering. Smith had questioned the validity of the test, stating that individuals with intellectual disabilities will oftentimes score incorrectly on those tests. But Dreyer said that Deloney's test results were so low that the results could only have been the result of actively trying to miss as many questions as Deloney did. Dreyer concluded that "[w]ith the information which I had available from the transcripts and testing that was completed at Summit, it was my opinion that his adaptive functioning was not consistent with that of individuals with intellectual disability." Dreyer further found that there was "[n]o indication that he has significant limitations in adaptive functioning in at least two areas."

### The Trial Court's Decision

{¶10} In the trial court's lengthy decision, it began with a discussion of the procedural history of the case, the reports and testimony of the doctors, and the standards under *Atkins* and *Lott*. The court noted that Deloney must demonstrate, by a preponderance of the evidence, "1) significant sub-average intellectual

functioning, 2) significant limitations in two or more adaptive skills, and 3) onset before the age 18." The court then determined that the Deloney had demonstrated significant subaverage intellectual functioning based on his low intelligence testing scores when he was 13, and that it had begun before he had turned 18 years old.

{¶11} The court then went on to determine whether Deloney had demonstrated significant limitations in two or more adaptive skills. The court noted that such determinations are made through adaptive behavior tests using "informants," who are individuals who know the defendant and are able to report his or her ability to perform a number of rudimentary life skills. But, "given the lack of cooperation from family members, there is very little information regarding Defendant's current adaptive behavior skills." The court then went on to say that

[w]hile lacking in current psychometric testing results, under the DSM-5, current SIB-R results are not required for a finding of intellectual disability. Moreover, the record is replete with evidence of Defendant's significant limitations in adaptive functioning. Adaptive functioning testing prior to age 18 yielded a Composite score within the range of intellectual disability. Likewise, there is substantial evidence of the significant limitations in Defendant's adaptive skills. Defendant has little to no independent living skills as there is no evidence that he has ever lived on his own. Defendant has a virtually nonexistent employment record, failing to keep up with the demands of even the most basic manual labor positions. His attempt to enroll in college level courses at Cincinnati State Technical and Community College was unsuccessful given his need for developmental classes. Most telling is Defendant's willingness to face the possible imposition of a death sentence rather than be labeled as intellectually disabled.

As noted by Smith, Defendant's continued refusal to cooperate with counsel and submit to psychological testing is indicative of Defendant's inability to think cognitively or to process information necessary to make important decisions, demonstrating a deficit in the area of communication. For these reasons, the Court finds sufficient evidence demonstrating that Defendant is significantly limited in two or more adaptive skills, namely communication, home living, self-care, functional academics, and work.

The trial court then granted Deloney's motion, concluding that "Defendant John Deloney is excluded from facing a possible death sentence in this case." The state has appealed that determination.

### The *Atkins-Lott* Test

{¶12} In June 2002, the United States Supreme Court ruled that executing a mentally retarded offender violates the proscription against cruel and unusual punishment contained in the Eighth Amendment to the United States Constitution. *See Atkins*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335. The *Atkins* court left to the states the task of establishing procedures and substantive standards for adjudicating an *Atkins* claim. *Id.* at 317. In December of that year, the Ohio Supreme Court established procedures and substantive standards for adjudicating a death-eligible defendant's claim of mental retardation. *See Lott*, 97 Ohio St.3d 303, 2002-Ohio-6625, 779 N.E.2d 1011.

{¶13} The *Lott* court determined that clinical definitions of mental retardation require a showing of (1) significantly subaverage intellectual functioning, (2) significant limitations in two or more adaptive skills, such as communication, self-care, and self-direction, and (3) onset before the age of 18. *Id.* at ¶ 12. These criteria were taken from the clinical definitions of mental retardation provided in

8

1992 by the American Association of Mental Retardation and in 2002 by the American Psychiatric Association, and cited with approval by the United States Supreme Court in *Atkins*. *Id.*

{¶14} The determination of whether a capital defendant is, by the *Lott* court's definition, mentally retarded presents a factual issue for the trial court. *State v. Gumm*, 169 Ohio App.3d 650, 2006-Ohio-6451, 864 N.E.2d 133, ¶ 25 (1st Dist.), citing *Lott* at ¶ 12. And an appellate court may not reverse the trial court's determination if it was supported by reliable, credible evidence. *Id.*, citing *State v. Were*, 1st Dist. Hamilton No. C-030485, 2005-Ohio-376, ¶ 78. In making the determination, the trial court "should rely on professional evaluations of [the defendant's] mental status, and consider expert testimony, appointing experts if necessary, in deciding this matter." *Lott* at ¶ 18.

### *Atkins-Lott* and the Importance of Expert Opinions

{¶15} It is not enough for a defendant to demonstrate significant limitations in adaptive skills; the limitations must be tied to purported mental retardation. The Tenth Appellate District addressed the argument that functioning need not be tied to mental retardation in *State v. Burke*, 10th Dist. Franklin No. 04AP-1234, 2005-Ohio-7020, stating

> Defendant suggests mental retardation has many different origins and the inquiry is whether a real world impact results from the intellectual impairment. Defendant states, "[t]he fact that there is a possibility of an alternative source for one or more of the adaptive limitations does not preclude a mental retardation diagnosis." While defendant's suggestion is legitimate, it does not follow that every individual who exhibits some limitations in adaptive skills is mentally retarded.

9

Mental retardation, even mild retardation, is not a common occurrence. *Atkins, supra* (noting only one to three percent of the population is so limited as to be classified as such). Defendant still must prove that significant adaptive limitations more likely than not result from mental retardation. *Atkins*; *Lott, supra.*

*Burke* at ¶ 39.

{¶16} So, the issue is not merely the demonstration of limitation in demonstrated adaptive skills, but that there is a causal connection between these limitations and mental retardation. Causal connections must be established by expert testimony, unless the question of cause and effect is so apparent as to be a matter of common knowledge. *See Darnell v. Eastman*, 23 Ohio St.2d 13, 261 N.E.2d 114 (1970), syllabus; Evid.R. 702. As with an injury and its causal relationship to a physical disability, proving the causal connection between mental retardation and significant limitations in adaptive skills "involves a scientific inquiry and must be established by the opinion of medical witnesses competent to express such opinion." *Terry v. Caputo*, 115 Ohio St.3d 351, 2007-Ohio-5023, 875 N.E.2d 72, ¶ 16.

{¶17} The determination as to whether an individual is mentally retarded, and suffers from limitations caused by that condition, is not something within the common knowledge of lay people. Smith testified in this case that you "can't judge a book by its cover." He said that individuals with mild mental retardation "lose their sense of label" and that they learn behaviors to mask or compensate for their deficiencies, calling it the "cloak of confidence." As the Ohio Supreme Court noted, "they may look relatively normal in some areas and have certain significant limitations in other areas." *State v. White*, 118 Ohio St.3d 12, 2008-Ohio-1623, 885 N.E.2d 905, ¶ 65. The *White* court concluded that the trial court had abused its

discretion when it disregarded the uncontradicted opinions of two expert witnesses who opined that White was mildly mentally retarded, relying in part on the lay testimony of family and friends who did not think he suffered from deficiencies. *See id.* at ¶ 73.

> While the trial court is the trier of fact, it may not disregard credible evidence and uncontradicted expert testimony in favor of either the perceptions of lay witnesses or of the court's own expectations of how a mentally retarded person would behave. Doing so shows an arbitrary, unreasonable attitude toward the evidence before the court and constitutes an abuse of discretion.

*Id.*

{¶18} Without expert testimony to link perceived deficiencies in adaptive skills, the trial court would be left with only "its own expectations of how a mentally retarded person would behave." In a case in which the Ohio Supreme Court considered whether trial counsel was ineffective for failing to make an *Atkins* claim, the court noted that while the record contained evidence that could indicate "his limitations in adaptive skills," neither of the two experts who examined him "*found that Frazier has significant limitations in adaptive functioning in at least two * * * skill areas as Atkins requires.*" (Quotations omitted.) (Emphasis added.) *State v. Frazier*, 115 Ohio St.3d 139, 2007-Ohio-5048, 873 N.E.2d 1263, ¶ 159. The court thereby emphasized not just the importance of showing that a defendant fails to perform certain functions, but also the requirement that an expert tie this failure to an intellectual deficit.

{¶19} This conclusion is further supported by the line of jurisprudence in Ohio that has held that, in spite of significant evidence of mental retardation developed in a death-penalty trial during the penalty phase, a defendant is still

entitled to the appointment of an expert in a postconviction proceeding premised on *Atkins* and *Lott. See State v. Hughbanks*, 159 Ohio App.3d 257, 2004-Ohio-6429, 823 N.E.2d 544 (1st Dist.); *State v. Bays*, 159 Ohio App.3d 469, 2005-Ohio-47, 824 N.E.2d 167 (2d Dist.); *State v. Waddy*, 10th Dist. Franklin No. 05AP-566, 2005-Ohio-2828; *State v. Lorraine*, 11th Dist. Trumbull No. 2003-T-0159, 2005-Ohio-2529. Experts are necessary because

> the penalty-phase evidence was offered to probe the issue of whether his mental illness mitigated against the imposition of the death penalty. It was not intended to probe the issue, posed by his *Atkins* claim, of whether he fell within the range of mentally retarded offenders whose execution the Eighth Amendment prohibited.

*Hughbanks* at ¶ 12. These experts were necessary even though "[the evidence presented at] Hughbanks's trial could inform the common pleas court's postconviction inquiry into his *Atkins* claim." *Id.* If experts were not necessary to tie deficits to alleged mental retardation, the trial court could simply examine the psychological evidence presented at the penalty phase and reach its own conclusions on the factors set forth in *Lott*.

### No Linkage between Significant Limitations in Adaptive Skills and Purported Mental Retardation

{¶20} The problem with the lack of an expert opinion to support his claim is highlighted further when examining the trial court's decision to grant Deloney's motion. The trial court listed four areas in which it found that Deloney had demonstrated a significant limitation in adaptive skills. But none of these limitations were tied through expert testimony to Deloney's purported mental retardation.

{¶21} The trial court first stated that Deloney had shown significant limitations in home-living and self-care because he had "little to no independent

living skills as there is no evidence that he has ever lived alone." But the lack of evidence of engaging in a behavior is not the same as evidence of the *inability* to engage in that behavior. The fact that he had lived the majority of his life either with his parents or his girlfriend does not demonstrate that he was *incapable* of living on his own, only that he had not actually done so. Neither expert testified that they had seen evidence of his inability to live on his own and that this inability was tied to mental retardation. Without such testimony, there was no competent, credible evidence to support the trial court's conclusion that Deloney had significant limitations in the areas of home-living and self-care.

{¶22} The trial court next found that Deloney had shown significant limitations in the area of work, noting that he had "a virtually nonexistent employment record, failing to keep up with the demands of even the most basic manual labor positions." But, again, there was no expert testimony linking his employment record to his purported mental retardation. The experts had very limited documentation regarding Deloney's employment history. They were given no reason why his employment was terminated by Frisch's. And as to his termination from Long John Silver's, the record only indicated that he was "not able to keep up." While Smith said that this could "show the possibility" that he was not showing independent functioning in a vocational setting, he also conceded that it could have shown that he was simply unwilling to do the work. Smith was unable to opine that Deloney had failed at even this single instance of employment due to his purported mental retardation, opining only that it would show "the possibility that, again, he's not showing independent functioning in a vocational setting." The trial court lacked competent, credible evidence to support its finding in this area.

{¶23} The third area of significant limitation that the trial court found was in the area of functional academics, stating that "his attempt to enroll in college level

courses at Cincinnati State Technical and Community College was unsuccessful given his need for developmental classes." Smith had reviewed only a one-page summary of Deloney's academic record at Cincinnati State. While he stated that it was "a snapshot of someone who had apparently crashed and burned," he had no further insight into Deloney's experience there, including such fundamental information as the requirements of the program in which he had been enrolled. The record is devoid of any explanation of why he did not do well in the courses, which could be explained by any number of reasons not related to intellectual disability. Additionally, nothing in this record supports the conclusion that the need to enroll in "remedial courses" demonstrates a significant limitation in the area of functional academics caused by mental retardation. According to the Ohio Department of Higher Education, 26,334 of the 81,684 students enrolling in an Ohio public college for the first time enrolled in remedial coursework. That represents 32 percent of first-time attendees. Ohio Dept. of Higher Edn., *2016 Ohio Remediation Report*, https://www.ohiohighered.org/sites/ohiohighered.org/files/uploads/Link/2016 -Remediation-Report.PDF (accessed Oct. 26, 2017). This number would indicate that such enrollment has explanations other than mental retardation. And without an expert opinion to link them, the trial court lacked competent, credible evidence to support its finding.

{¶24} Finally, the trial court concluded that Deloney had proven significant limitations in the area of communication due to his continuing to refuse to cooperate with his *Atkins* evaluations. The court claimed that Smith had opined that his "continued refusal to cooperate with counsel and submit to psychological testing is indicative of Defendant's inability to think cognitively or to process information necessary to make important decisions, demonstrating a deficit in the area of communication." But when asked whether his failure to cooperate "related back to

his MR," the best that Smith could say was that "it very likely could." Smith concluded that the information he had was "supporting evidence that shows a *strong suspicion* that he does have an intellectual disability." But this evidence, standing alone, is not competent, credible evidence that Deloney was deficient in the area of communication due to his mental retardation.

### Deloney's Failure to Cooperate
### Main Reason for Failure of Proof

{¶25}   His failure to produce proof to support his claim rests entirely with Deloney himself. As early as March 2014, Deloney appeared before the trial court and informed the court that he had no intention of cooperating either with counsel or with the *Atkins* assessment. Defense counsel also indicated that the family members had refused to speak to them or their mitigation specialist. This occurred repeatedly, with Deloney not only refusing to cooperate with the experts, but also repeatedly informing the trial court that he did not wish to pursue an *Atkins* claim.

{¶26}   Deloney had the burden of proof to establish his claim under *Atkins* and *Lott* by a preponderance of the evidence. *Lott*, 97 Ohio St.3d 303, 2002-Ohio-6625, 779 N.E.2d 1011, at ¶ 14. The "burden of proof" is a composite burden that "encompasses two different aspects of proof: the burden of going forward with evidence (or burden of production) and the burden of persuasion." *Chari v. Vore*, 91 Ohio St.3d 323, 326, 744 N.E.2d 763 (2001). In this context,

> [t]he party having this burden on any given issue will lose on that issue as a matter of law if evidence sufficient to make out a case for the trier of fact is not produced. Similarly, if a party has the burden of going forward with evidence of a fact and fails to do so, the judge and the jury must assume the non-existence of the alleged fact.

15

*State v. Robinson*, 47 Ohio St.2d 103, 107, 351 N.E.2d 88 (1976). Because of the refusal of Deloney and his family to cooperate with the expert witnesses in this case, the experts were unable to form professional opinions as to whether he suffered from significant deficits in two or more areas of adaptive functioning.

{¶27} Smith referenced his failure to cooperate as an indication that Deloney might not understand the significance of what was happening and the importance of his cooperation. But none of the experts were able to provide an opinion that Deloney's refusal to cooperate was a product of an intellectual disability. And Deloney had repeatedly been found competent to stand trial. In 2013, Dr. Julia King had found that he exhibited "a reasonably thorough factual understanding of the legal proceedings against him," that he was "capable of understanding the charges against him, his plea options and the roles and functions of key courtroom personnel," and that he was capable of "comprehending instructions, evaluating legal advice, and of making decisions in his own best interests." These determinations were confirmed by reviews by Drs. Charles Lee and Neal W. Dunsieth, conducted at the same time. Dr. Annette Reynolds, who evaluated Deloney's competence during the period of his refusal to cooperate with the *Atkins* evaluations, also found him competent, stating

> Mr. Deloney understood the purpose and nature of the *Atkins*
> evaluations and how it could affect his case. Despite previous refusals,
> he said he had decided to participate in the evaluation on the advice of
> his attorney. He provided understandable reasons related to
> childhood abuse about why he would not want to undergo the
> evaluation, but he also understood that an evaluation could help his
> case, and he said he would try his best on the evaluation. This showed

that he had a rational understanding of the *Atkins* evaluation and could make an informed decision about whether to participate.

{¶28}  The measurement of adaptive skills is traditionally completed by conducting the Scales of Independent Behavior-Revised battery.  *White*, 118 Ohio St.3d 12, 2008-Ohio-1623, 885 N.E.2d 905, at ¶ 14.  The test is administered to people who know the subject, who provide information about the subject's abilities.  *Id.* at ¶ 15.  While it is preferred that informants be used, the subject may also be used to perform the test.  *Id.* at ¶ 53.  While Smith testified that use of the test is not the only way to make the determination, experts must have some source of data.  Without the cooperation of Deloney or his family in the assessment of his ability to engage in the adaptive behavior to be evaluated, there was no practical way for the experts to render a professional opinion upon which the trial court could base its findings.

### Trial Court's Decision Not Supported by Competent, Credible Evidence

{¶29}  The trial court listed four areas in which it found no evidence of Deloney's adaptive functioning.  But in none of these areas—communication, home-living and self-care, education, or work—was there any testimony that Deloney's demonstrated failure to engage effectively in the areas was the result of an intellectual disability.  At most, the record demonstrated that Deloney had not maintained gainful employment, had spent most of his life living with others rather than on his own, had failed classes at Cincinnati State, and had refused to cooperate with counsel and doctors in the process of preparing for the *Atkins* hearing.  But without connecting these facts to an intellectual disability, they do not represent proof of significant limitations in adaptive functioning.  Therefore, the decision of the

17

trial court to grant Deloney's motion was not supported by competent, credible evidence.

### Conclusion

{¶30} We hold that Deloney failed to meet his burden to show that he is mentally retarded. We sustain the state's sole assignment of error, reverse the judgment of the trial court, and remand the cause to the trial court for further proceedings consistent with law and this opinion.

Judgment reversed and cause remanded.

**DETERS, J.**, concurs.
**ZAYAS, J.**, concurs in judgment only.

**ZAYAS, J.,** concurring in judgment only.

{¶31} I agree that the trial court erred in finding there was competent, credible evidence to show that Deloney is mentally retarded pursuant to *Atkins*. However, I would conclude that Deloney failed to prove that he currently exhibits *significant* adaptive limitations.

{¶32} To succeed on an *Atkins* claim, Deloney was required to prove, by a preponderance of the evidence, that he "(1) suffers from significantly subaverage intellectual functioning, (2) experienced significant limitations in two or more adaptive skills, such as communication, self-care, and self-direction, and (3) manifested onset before the age of 18." *Frazier*, 115 Ohio St.3d 139, 2007-Ohio-5048, 873 N.E.2d 1263, at ¶ 154, quoting *Lott*, 97 Ohio St.3d 303, 2002-Ohio-6625, 779 N.E.2d 1011, at ¶ 12. In formulating this standard, the Ohio Supreme Court concluded that the clinical definitions of mental retardation, cited with approval in *Atkins*, and promulgated by the American Association on Mental Retardation ("AAMR") and the American Psychiatric Association ("APA") govern a claim of mental retardation. *Lott* at ¶ 12.

18

{¶**33**} The AAMR defines mental retardation as " 'characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. Mental retardation manifests before age 18.' " *Atkins*, 536 U.S. 304, 308, 122 S.Ct. 2242, 153 L.Ed.2d 335, at fn. 3, quoting *Mental Retardation: Definition, Classification, and Systems of Supports* 5 (9th Ed.1992).

{¶**34**} The APA's definition is similar: " 'The essential feature of Mental Retardation is significantly subaverage general intellectual functioning * * * that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety * * *. The onset must occur before age 18 years * * *. "Mild" mental retardation is typically used to describe people with an IQ level of 50 to 55 to approximately 70.' " *Id.*, quoting *Diagnostic and Statistical Manual of Mental Disorders* 41-43 (4th Ed.2000).

{¶**35**} Under both definitions, mental retardation is proven by a significantly subaverage intellectual functioning existing concurrently with, or accompanied by significant limitations in adaptive functioning, with the onset before the age of 18. Thus under *Lott*, an *Atkins* claim requires the defendant to prove that the adaptive limitations coexist with or are accompanied by the intellectual limitations.

{¶**36**} Accordingly, I cannot agree with the majority that there is an additional requirement of expert testimony to tie or link the adaptive limitations to mental retardation in all *Atkins* cases. The majority relies on *State v. Burke*, but in that case, the defendant failed to prove subaverage intellectual functioning because

his full scale IQ was 78. *Burke*, 10th Dist. Franklin No. 04AP-1234, 2005-Ohio-7020, at ¶ 12. Moreover, the defendant's expert agreed that the defendant's limitations in adaptive skills could have been caused by the defendant's alcoholism and significant antisocial traits. *See id.* at ¶ 34-37. In cases like *Burke*, where the evidence demonstrated an alternative explanation for the adaptive limitations, expert testimony may be necessary to link the adaptive limitations to mental retardation.

{¶37} In this case, Deloney's school records show that he was tested by the school psychologist when he was 13 years old and obtained a full-scale IQ score of 63, placing him within the mild range of mental retardation. As part of this evaluation, the school psychologist also administered the Vineland Adaptive Behavior Scale ("VABS"), which tested for adaptive limitations to ensure the low IQ test was a result of mild mental retardation and not a result of poor test-taking skills. Deloney obtained a score of 68 on the VABS, again placing him in the mild range of mental retardation. Therefore, as Dr. Smith explained, Deloney exhibited concurrent deficits in intellectual functioning and adaptive limitations prior to the age of 18.

{¶38} Following this evaluation, Deloney was given an Indivdualized Education Plan and continued to qualify for special education up to age 19. School records indicate that Deloney was classified with a mild mental disability and was not able to participate in any general academic classes. He was also enrolled in a "Life Skills" class in high school to address his adaptive deficiencies. While reviewing Deloney's educational progress, the school psychologist administered another IQ test when he was 19 years old. This IQ score was consistent with the first and placed him within the mild range of mental retardation.

{¶39} After reviewing Deloney's school records, Smith testified to a reasonable degree of psychological certainty that Deloney suffered from significantly

subaverage intellectual functioning concurrent with significant adaptive limitations prior to age 18. Smith further testified that Deloney's IQ scores, placing him in the range of mild mental retardation at the ages of 13 and 19, would not change significantly throughout his adulthood absent a brain injury or illness.

{¶40} This record supports the trial court's determination that Deloney suffers from significantly subaverage intellectual functioning with an onset prior to 18. The record also supports the finding that Deloney experienced significant adaptive limitations prior to the age of 18.

{¶41} However, the record does not support a finding that Deloney currently experiences significant adaptive limitations. Although Dr. Smith strongly suspected that Deloney was significantly limited in two or more adaptive skills, without additional evidence of those limitations, Deloney failed to meet his burden of proof. That additional evidence could have come from more extensive records of his work history and educational history at Cincinnati State or from the cooperation of Deloney, his family, or his girlfriend.

{¶42} Because Deloney was unable to prove that he is currently experiencing significant adaptive limitations, I would sustain the assignment of error, reverse the judgment of the trial court, and remand the cause to the trial court for further proceedings.

Please note:
The court has recorded its own entry on the date of the release of this opinion.